IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| HOLY CROSS HOSPITAL, INC., ) | Civil Action No. |
| Plaintiff, ) |  |
| v. ) |  |
| AMERICAN ANESTHESIOLOGY ) | **COMPLAINT FOR DECLARATORY** |
| SERVICES OF FLORIDA, INC., ) | **JUDGMENT** |
| AMERICAN ANESTHESIOLOGY, INC., ) |  |
| NMSC II, LLC and NORTH AMERICAN ) |  |
| PARTNERS IN ANESTHESIA, L.L.P., ) | **DEMAND FOR JURY TRIAL** |
| Defendants. ) |  |

Plaintiff Holy Cross Hospital, Inc. ("Holy Cross") brings this action against Defendants American Anesthesiology Services of Florida, Inc., ("American Anesthesiology"), American Anesthesiology, Inc., NMSC II, LLC ("NMSC") and North American Partners in Anesthesia, LLP ("NAPA") (collectively, "Defendants"), based on the following allegations:

<u>**INTRODUCTION**</u>

1.      Holy Cross is bringing this case because Defendants (who are the exclusive providers of professional anesthesia services at Holy Cross) are using noncompete and nonsolicitation clauses to severely restrict competition and to demand exorbitant payments for critical and understaffed patient services. Defendants seek to compel Holy Cross to retain them at its hospital, no matter what terms they demand, by prohibiting their providers from freely choosing to work at Holy Cross and thereby cutting off any other sources of anesthesia care. Alternatively, Defendants have demanded an exorbitant multi-million payment to waive the noncompetes.

2.      Overall competition in a number of markets is impacted by Defendants' anticompetitive actions, because this is very far from a typical case involving noncompete restrictions. American Anesthesiology employs approximately 24 anesthesiologists, 25 certified nurse anesthetists ("CRNAs") and four anesthesiologists' assistants ("AAs") who work at Holy Cross, and all are bound by noncompetes. Since anesthesia care is necessary for all surgery, many invasive cardiac procedures, all endoscopies, and many other hospital services, these noncompetes and the nonsolicitation clause threaten to broadly interfere with operations at the hospital, deprive patients to access of care at their chosen hospital and doctors, and harm health care competition and the provision of hospital services in Broward County.

3.      Noncompetes and nonsolicitation clauses relating to physician contracts are common when needed to protect (a) patient relationships the physicians may have gained by virtue of the efforts of their employer, (b) trade secrets, or (c) the value of extraordinary or specialized training. But hospital-based anesthesia providers do not have their own patients, they have no trade secrets, and the anesthesia providers received their training before they came to work for Defendants. Indeed, many have worked at Holy Cross for many years. Defendants utilize scheduling software, but anesthesia scheduling software products are readily available for sale and Holy Cross' affiliates at Trinity Health already utilize such products. Therefore, there is no reasonable justification for these clauses.

4.      NAPA's conduct as described herein makes clear that it does not see the noncompetes as needed to protect it against unfair competition, but uses them to impede the free movement of its providers so that it can capture the value of their scarce services. Indeed, Rafael Cartagena, the CEO of NAPA, has referred to the providers as NAPA's "assets." But the providers are not assets to be controlled or exploited by private equity firms such as NAPA. The

noncompetes should be declared void so that the anesthesia providers can freely offer their services to patients in need.

5.    Defendants' insistence on enforcing the noncompetes and nonsolicitation clause violate federal and state antitrust laws. Because Defendants are demanding enforcement of these anticompetitive clauses, Holy Cross is forced to file this litigation to seek a determination that these clauses are unlawful and that Holy Cross can offer employment to American Anesthesiology's anesthesia providers in competition with American Anesthesiology.

6.    The actions described herein have also been undertaken by Defendants (and a related local subsidiary) at another hospital affiliated with Holy Cross, St. Joseph's in Syracuse, New York. St. Joseph's has very similar claims to those brought here by Holy Cross. However, because the St. Joseph's contract provides that venue for any litigation must be in the location at which services are provided, a separate lawsuit is being filed by St. Joseph's in the Northern District of New York raising substantially the same issues as in this lawsuit.

## THE PARTIES

7.    Plaintiff Holy Cross Hospital, Inc. is a faith-based, nonprofit, tax exempt corporation organized under and by virtue of the laws of Florida and is headquartered in Ft. Lauderdale, Florida.

8.    Holy Cross operates a 557 licensed bed hospital in Ft. Lauderdale, Florida, offering a variety of inpatient and outpatient services, including cardiology and surgery.

9.    Holy Cross has won numerous awards for its strong commitment to patient quality, safety, and satisfaction, including in particular in surgery and heart care.

   a.    Holy Cross is a "Blue Distinction" hospital for cardiac surgery. Blue Distinction hospitals are recognized by Blue Cross Blue Shield plans as offering extremely high quality.

50990237.22

b.     Holy Cross has received four stars for quality from the Centers for Medicare and Medicaid Services, better than or equal to the highest rating for a hospital in Broward County. Holy Cross has long received a grade from the LeapFrog Group for its successful practices reducing patient harm that is superior to that of other hospitals in the area.

c.     Holy Cross was recently recognized by U.S. News & World Report as High Performing in six areas, including knee replacement and hip replacement surgeries.

10.     Defendant American Anesthesiology is a Florida corporation based in Melville, New York, with its headquarters office in Melville, New York.

11.     American Anesthesiology's parent corporation is American Anesthesiology, Inc. American Anesthesiology, Inc. is a Florida corporation, based in Melville, New York.

12.     The parent corporation of American Anesthesiology, Inc. is NMSC II, LLC, a Delaware limited liability company ("NMSC") with its registered agent in Dover, Delaware. In 2020, NMSC purchased the stock of American Anesthesiology, Inc. from MedNax Corporation.

13.     NMSC is a subsidiary of North American Partners in Anesthesia, L.L.P. ("NAPA"). NAPA is a New York limited liability partnership, based in Melville, New York. NAPA's website says that it employs 5,000 clinicians, and provides services at 400 facilities nationwide in 22 states. It says that it serves over 2 million patients annually and has approximately $1.8 billion in annual revenues. NAPA says that it is the largest anesthesia services provider in North America.

14.     NAPA is the ultimate parent of American Anesthesiology. NAPA executives, including Peter Doerner and others, directly participated in the negotiation of the contract terms

4

applicable to the relationship between Holy Cross and American Anesthesiology. NAPA supervises and directs the actions of American Anesthesiology. NAPA's executives have been involved in detail in numerous ongoing discussions relating to the operation of anesthesia services at Holy Cross, including staffing issues. These executives have included Justin Crain, Claudio Asceri, Christopher Reed and Trent Walter. American Anesthesiology's officers are all NAPA executives, including Mr. Cartagena, Mr. Crain, Beth Green, John Bugos and Rebecca Downey.

15.     The operating agreement between Holy Cross and American Anesthesiology (since amended) (the "Agreement") was signed by Rebecca Downey, the Vice President for Clinical Services for NAPA's Southern Region. Dr. Downey also signed the First Amendment to the Agreement. The Second, Third and Fourth Amendments to the Agreement were signed by Claudio Asceri, the Vice President of Clinical Services for NAPA's Southern Region. Notice under the Agreement is to be provided to Beth Green, NAPA's Vice President and General Counsel.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1367; Sections 4 and 16 of the Clayton Act, U.S.C. §§ 16 and 26; and Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court has exclusive jurisdiction over the claims in this case brought pursuant to the Sherman Act and Clayton Act.

17.     Defendants transact business in this district and are subject to personal jurisdiction therein. American Anesthesiology's services are performed at Holy Cross Hospital in this district, and Section XV of the Agreement provides that venue shall be proper in the jurisdiction where the services were performed or delivered. The actions complained of herein and giving rise to this Complaint took place in this district. Personnel of NAPA, including Peter

Doerner, NAPA's Executive Vice President and Chief Development Officer, and Rafael Cartagena, NAPA's CEO, have been directly involved in in negotiations relating to the provision of services in this District, and, as described above, other NAPA personnel have been directly and repeatedly involved in issues relating  to American Anesthesiology's provision of services in this District. Holy Cross also has maintained its principal place of business in this district, and faces the threat of injury in this district. Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391, as well as the provisions of the Agreement.

## TRADE AND COMMERCE

18.     Defendants are engaged in interstate commerce and their activities substantially affect interstate commerce. Millions of dollars of American Anesthesiology's annual revenues for treatment of patients at Holy Cross come from sources located outside of Florida, including payments from Medicare and out-of-state commercial payors, including Aetna, Cigna, United Healthcare, Humana and others. American Anesthesiology treats a significant number of patients from states other than Florida, including many surgical and heart cases at Holy Cross involving out-of-state patients. This includes at least hundreds of thousands of dollars involving treatment of patients who reside in Florida in the winter and in other states during the remainder of the year. NAPA provides management services to its health care providers in 22 different states. NAPA clinicians treat more than 2 million patients annually across these states.

19.     Holy Cross receives hundreds of millions of dollars of annual revenue for procedures requiring anesthesia from sources located outside of Florida, including payments from Medicare and from out-of-state commercial payors, including Aetna, Cigna, United Healthcare, Humana and others. Holy Cross also receives millions of dollars in annual revenues for the treatment of patients from out of state who receive services requiring anesthesia. This includes approximately 200 inpatients annually, with net revenues of thousands of dollars per

case, and a similar number of outpatient cases, with net revenues totaling more than $1 million annually.

20.    Defendants' actions will result in a substantial reduction in competition in the relevant antitrust markets described below, which will substantially affect payments made in interstate commerce by Medicare and commercial payors, as well as payments made by the parties in interstate commerce.

## FACTUAL ALLEGATIONS

### The Role of Anesthesia Providers

21.    An anesthesiologist is a physician, with four to five years of post-medical school training, who specializes in the delivery of anesthesia and related care of patients before, during, and after surgery and other procedures requiring anesthesia. Anesthesiologists also meet with patients and their physicians before these procedures to evaluate patients' health and to ensure that patients' anesthesia care is safe and effective. A CRNA is an advanced practice registered nurse with graduate level education who also provides anesthesia services often in concert with the physician team. An AA also works under the direction of an anesthesiologist in providing anesthesia care.

22.    Anesthesia providers administer anesthesia so patients do not feel pain when they are undergoing these procedures. Prior to surgery they place invasive lines and regional nerve blocks. They also perform other functions, including monitoring and maintaining patients' normal vital signs (e.g., respirations, pulse, blood pressure, body temperature); identifying and treating any related emergencies that may occur before, during, or after the procedures (e.g., allergic reactions to medication, bleeding, changes in vital signs); and controlling pain and providing other care post-procedures.

23.     These providers play critical roles in the care of patients in every hospital, since anesthesia is required for all, or virtually all, surgeries and more invasive cardiac procedures, as well as all endoscopies, among other procedures. Other procedures which require anesthesia at Holy Cross include bronchoscopies and interventional radiology. Surgeries and invasive cardiac procedures are essential components of the services provided by virtually every hospital, to assure full service care to their patients. Since these procedures are the most profitable, their offering also helps hospital systems to be able to afford to offer to patients often unprofitable but necessary medical procedures.

24.     Anesthesiologists are able to delegate certain tasks to CRNAs and AAs, while supervising their work, freeing up the anesthesiologists' to provide oversite and care for several cases simultaneously. Therefore, CRNAs help relieve the demand for anesthesiologists personally performing every case.

25.     Typically, hospitals obtain the services of anesthesia providers either by employing them or contracting with an independent group which employs a significant number of the anesthesia providers. Most patients are only indirect purchasers of anesthesia services, with the exception of any copays or deductibles.

26.     In seeking the services of anesthesia providers, hospitals may consider both local and national groups. However, all of these groups depend significantly on the supply of anesthesia providers in the local area in which the hospital is situated. Most anesthesia providers are unwilling to uproot their families and relocate unless they were to receive compensation at levels substantially above market rates. In addition, a stable relationship with a core group of local anesthesia providers who know the surgeons, other proceduralists and nursing teams working at the hospital highly enhances the care of patients.

27.     There is a significant shortage of anesthesia providers nationally, and that shortage is expected to grow. In its recent presentations, NAPA has referred to a "National Anesthesia Provider Shortage". According to data provided by NAPA, job postings for anesthesia providers have at least doubled from October 2018 to June 2023. According to NAPA, the demand for anesthesia providers has significantly increased, due to more complex hospital cases and a higher volume of procedures performed in ambulatory surgery centers ("ASCs") and other outpatient settings, increasing the number of venues requiring anesthesia providers. According to public sources, greater than 2,800 anesthesiologists left the work force in 2021 and 2022. NAPA projects a shortage of over 12,000 anesthesiologists over the next decade. For this reason, it is very difficult for a hospital to replace an anesthesiology group.

28.     Subspecialty anesthesia training provides additional skills which are needed to provide anesthesia for cardiothoracic surgeries and interventional pain. For example, cardiac anesthesiologists must also achieve additional board certifications in transesophageal echocardiography. These specialty trained services are in even more limited supply.

### Holy Cross Agreements with American Anesthesiology

29.     American Anesthesiology entered into an agreement with Holy Cross to provide anesthesia services in 2021 (the "Agreement"). The Agreement's term has been extended several times, and is currently set to expire on July 1, 2024.

### Defendants' Conduct

30.     The Agreement has imposed unreasonable payment requirements on Holy Cross in numerous respects:

a.      American Anesthesiology directly charges patients, Medicare, Medicaid, and managed care plans for its providers' services, but requires that Holy Cross subsidize its services, i.e. pay the difference between the revenues

9

collected by American Anesthesiology and its "expenses," defined as the amounts it pays to anesthesia providers plus an overall fee (comprising an administrative fee, a clinical oversight fee, and a fee for "other expenses"). That overall fee includes profits. In 2023 that subsidy amounted to more than $3 million.

b. Under the parties' agreement, American Anesthesiology is not obligated to take adequate steps to maximize its revenues. Thus, for example, American Anesthesiology has no obligation to make reasonable efforts to collect the sums owed it. Nor does it have an obligation to minimize denials of claims submitted to managed care plans, Medicare or Medicaid. American Anesthesiology could take a number of steps to minimize denials, including negotiating its managed care contracts to appropriately address denial issues, appealing denials of claims and establishing procedures so that its providers adequately document their work so as to minimize the likelihood of denials. There are no such obligations contained in the Agreement, and Defendants have been unwilling to agree to benchmarks that would assure that they are adequately performing these functions.

c. American Anesthesiology's costs for clinical providers are unreasonably high because Defendants rely excessively on temporary anesthesia providers ("locum tenens") to fill permanent gaps in their staffing at Holy Cross. Locum tenens providers are paid far higher than typical rates for

employed providers. These factors have significantly increased the costs of anesthesia services to Holy Cross.

31.     Additionally, the use of locum tenens anesthesia providers is inherently less satisfactory than the use of permanently employed anesthesia providers. This is because the locum tenens physicians are temporary and do not have ongoing relationships with the surgeons and other physicians who perform the procedures that require anesthesia. These physicians would prefer to use hospital-based anesthesiologists they know and trust rather than to work extensively with locum tenens physicians.

32.     The amount charged by American Anesthesiology has become significantly greater over time. Required payments to American Anesthesiology have increased from no subsidy in 2021 to a subsidy in 2024 at an annualized rate of almost $4 million. The current subsidy is budgeted at $3.9 million. Holy Cross does not dispute that it owes the subsidy under the Agreement, but the growth is further evidence of Defendants' ability to impose high costs due to their market power and the effects of the noncompete clauses.

33.     These reimbursement terms, and the levels of reimbursement obtained by Defendants, are substantially above the levels that would be paid in a competitive market. Defendants are able to obtain these levels of reimbursement only because of their elimination of competition through the enforcement of their noncompetes and the nonsolicitation clause.

34.     American Anesthesiology has also refused to provide a detailed breakdown of its costs to Holy Cross, which would permit Holy Cross to evaluate whether those costs were excessive.

35.     Defendants have been consistently unable or unwilling to adequately staff all Holy Cross procedures that require anesthesia, and have not made either commercially

11

reasonable or best efforts to do so. For example, Holy Cross on a regular basis has "add on" surgery cases added to its pre-existing surgery schedule. This reflects emergency cases coming through the emergency department as well as urgent cases involving patients who are in the hospital. Holy Cross keeps an "add on" team of nurses and operating room technicians available to address those cases, and Defendants are expected to provide anesthesiologists for those cases. However, on a regular basis, Defendants have not had anesthesia providers available for these cases because they have chosen to forego the expense of keeping physicians on-call to address these cases. This seriously interferes with hospital operations. Defendants' practices in this regard are not commercially reasonable and do not reflect their best or reasonable efforts. As a result, American Anesthesiology has been in continuous breach of its contract with Holy Cross.

36.     There have also been frequent failures to provide anesthesia coverage for bronchoscopies. Similar problems have occurred with regard to cardiac procedures in Holy Cross' cath lab and EP lab.

37.     Defendants' service and performance is below the level that would be provided in a competitive market.

38.     As a result of the unreliability of Defendants' anesthesia staffing, Holy Cross has had difficulty in maintaining the trust of its surgeons and other physicians performing procedures requiring anesthesia. This has caused significant harm to Holy Cross' ability to attract and retain cases from surgeons, cardiologists and other physicians who perform procedures which require anesthesia.

39.     The Agreement does not provide any penalties for American Anesthesiology in the event that it fails to adequately staff Holy Cross. Defendants have refused to accept responsibility for inadequate staffing.

40.     NAPA has faced controversies regarding its understaffing of hospital anesthesia services in numerous markets. For example, these same understaffing problems have been identified by Cooperman Barnabas Medical Center in Livingston, New Jersey and Renown Regional Medical Center in Reno, Nevada.

41.     Many of the anesthesia providers employed by Defendants are not happy with Defendants. One of the reasons is that American Anesthesiology and NAPA discourage the use of more sophisticated procedures such as ultrasound-guided blocks, because these procedures are more resource-intensive. Many of the anesthesia providers have expressed the view that they would much prefer to be directly employed by Holy Cross. But their noncompete agreements preclude this from happening. Other providers have indicated that they would leave Holy Cross if they are forced to continue to work for Defendants.

42.     Several anesthesiologists have left American Anesthesiology, because their compensation was inadequate. This accentuated the staffing shortfalls at Holy Cross.

**The Effects of the Noncompetes and Nonsolicitation Clause**

43.     The characteristics of the market for anesthesia services in Broward County and the contracts entered into by Defendants and Holy Cross give Defendants the power to effectively shut off anesthesia services at Holy Cross if Holy Cross will not pay Defendants what they demand. This is true for several reasons. The first arises from the post term noncompetition clauses entered into by at least all anesthesia providers who work for Defendants at Holy Cross. As a result of these noncompetition clauses, these providers would be unavailable to Holy Cross after the expiration of the American Anesthesiology contract.

44.     Even a one year noncompete is more than sufficient to create these anticompetitive effects. Holy Cross cannot operate without anesthesia providers for any period of time.

13

45.     The second reason arises from the nonsolicitation clause in the contract between Holy Cross and American Anesthesiology. This clause prevents Holy Cross from inducing employees of American Anesthesiology to cease their employment with American Anesthesiology for a period of at least one year after expiration of the parties' contract.

46.     Third, anesthesiologists working at other hospitals in Broward County are unlikely to be significantly available to Holy Cross. The Memorial hospitals are served by the Envision Group, which also imposes a noncompete clause on its anesthesia providers which would preclude their working in the local area. The same is true of the Anesco group, which is the exclusive provider of anesthesia services at the Broward Health hospitals.

47.     Fourth, the extreme shortage of anesthesia providers nationally makes it especially difficult for hospitals to recruit additional providers.

48.     Fifth, the exclusivity provisions in the contracts between American Anesthesiology and Holy Cross mean that even if Holy Cross could obtain some of its anesthesia services elsewhere, the exclusivity clause would preclude it from doing so unless it allowed the contract to expire entirely.

49.     There is no possibility that Holy Cross could obtain anesthesia services from other sources at the volumes needed to completely replace the services rendered by American Anesthesiology and therefore to operate the hospital. Any effort to replace the anesthesia providers at Holy Cross en masse would create impossible problems in covering the care of patients for the hospital. Most of American Anesthesiology's providers at Holy Cross have worked at that hospital for many years, and have established close working relationships with Holy Cross surgeons, cardiologists and other physicians. If these physicians were forced to immediately work with other anesthesia providers with whom they were not familiar and the

14

replacement anesthesia providers were not familiar with the hospital facilities, this would cause a significant disruption at Holy Cross, and would also make it more likely that many of these surgeons, cardiologists, OB/GYNs and other proceduralists would shift some or all of their cases to other hospitals. This would harm both Holy Cross and overall competition in the market.

50.     For all these reasons, if Holy Cross sought to end its arrangement with Defendants without the opportunity to seek to employ Defendants' anesthesia providers, it would be faced with a critical shortfall in anesthesia care.

51.     At best, Holy Cross would be able to staff the hospital with locum tenens anesthesia providers, at rates even more expensive than what is charged by Defendants. Moreover, this would eliminate the continuity in anesthesia care which is valued by surgeons, cardiologists and other physicians performing the procedures that require anesthesia. And it is unlikely that a sufficient number of locum tenens providers could be obtained in order to fully staff the hospital. Therefore, a significant loss of procedures would be inevitable.

52.     This shortfall would both seriously harm patients needing care which requires anesthesia and cost Holy Cross critically needed funds. Surgeries and heart procedures are among the activities creating the greatest margin for hospitals, and are needed by Holy Cross in order for it to remain in business. In calendar year 2023, Holy Cross earned approximately $75 million in contribution margin from surgeries, heart procedures and other procedures requiring anesthesia care. Without the ability to provide surgeries and other procedures requiring anesthesia care, Holy Cross would face an impossible financial situation that would not allow it to remain in operation.

53.     Defendants' noncompetes with the Holy Cross anesthesia providers and the nonsolicitation clause therefore significantly enhance Defendants' market power. Because Holy

Cross has no adequate substitutes for its existing anesthesia providers, Defendants are able to demand higher than competitive rates and contract terms, because they know that the noncompetes preclude Holy Cross from accessing any realistic alternative to Defendants' anesthesia providers.

54.     In contrast to the $75 million at stake if aesthesia care is not available, Holy Cross total payments to Defendants for anesthesia services for the same period were approximately $3 million. This imbalance further illustrates why Defendants have such power over Holy Cross. Holy Cross is forced to pay exorbitant amounts to Defendants, because otherwise it faces losses that would dwarf the amount paid for anesthesia care.

55.     Defendants' insistence on enforcement of their noncompetes has forced Holy Cross to accept the unreasonable terms demanded by Defendants, to pay exorbitant amounts for anesthesia services, and to accept the staffing inadequacies and shortfalls engaged in by Defendants. These damages are in the millions of dollars.

**The Effect of Private Equity**

56.     NAPA is an example of "private equity" firms operating anesthesia practices. NAPA is owned by two well-known private equity firms, American Securities of New York City and Leonard Green & Partners in Los Angeles. Many of NAPA's directors are private equity executives.

57.     Private equity firms operate on a business model which involves the purchase of businesses, their operation for a few years at high profits, and then their resale. These profits are necessary to pay the interest on debt incurred through purchase of these entities. As a result, private equity firms, and the medical practices owned by private equity firms, have an incentive to underprovide care and to overcharge their customers in order to quickly earn unusual returns. A recent study found that more than 20% of the purchases of physician practices by private

equity firms involved anesthesia groups. A study published by the Journal of the American Medical Association Internal Medicine in February 2022 analyzed more than 2 million anesthesia claims from 2012 through 2017. The researchers found that costs rose by 26% after anesthesiology practices were taken over by private equity firms.

## **Holy Cross' Efforts to Improve Its Anesthesia Coverage**

58.     Because of its problems with NAPA, on December 29, 2023, Holy Cross and its affiliate St. Joseph's informed Defendants that they wished to attempt to negotiate either a new contract that appropriately shared the risks of underpayment, inadequate staffing and excessive costs between the parties, or negotiate an agreement that would allow Holy Cross and St. Joseph's to make offers to American Anesthesiology's providers without any claim by American Anesthesiology relating to its noncompetes or the nonsolicitation clause.

59.     In response, Defendants took the position that they were not interested in a new contract that would share risk. They stated that they were willing to negotiate a "buy out", but only at excessive terms, equal to a payment of more than $10 million. Defendants indicated that they would be willing to reduce this payment requirement by a modest amount to the extent that St. Joseph's and Holy Cross employed them to manage the anesthesia practices even after the providers were employed by Holy Cross and St. Joseph's.

60.     In response to Holy Cross' and St. Joseph's expressions of great concern and request for a reasonable offer, Defendants' agreed to reduce their buyout demand to a smaller, but still exorbitant number, to what they described as a "20% discount" to $8.921 million. But Defendants also demanded that along with these buyouts, that they be paid under a management services agreement at St. Joseph's, Holy Cross and their affiliate Samaritan Hospital, in Troy, New York.

61.     Defendants said that if the services agreements were continued with these hospitals, they would expect a three year contract, without any caps on the subsidies they received, without any shared risk if the subsidies grew, without any provisions addressing adequate steps to limit denials by insurers and without any of the other protections that St. Joseph's and Holy Cross requested so that the contract would be reasonable. Defendants also demanded a 5% escalator clause.

62.     Significantly, NAPA justified its demand for these huge payments by citing the shortage of anesthesia providers and the noncompete clauses. Mr. Cartagena of NAPA made it very clear that his demands were based upon the existence of the noncompetes and NAPA's willingness to enforce them. In fact, he referred to the anesthesia providers as NAPA's "assets." Of course, noncompetes are not justifiable as vehicles to impede the free movement of physicians or to make them a company's "assets."

63.     This demand does not bear any relationship to any conceivable claim of loss that Defendants would suffer due to unfair competition resulting from the hiring of the anesthesia providers by Holy Cross. In fact, there would not be any such losses, since there is no prospect of unfair competition. The demanded payment in fact exceeds the revenues paid to Defendants under the Agreement. The exorbitant nature of the demand thus reflects Defendants' effort to exercise their market power resulting from the existence of their noncompetition clauses. That effort is highly likely to succeed, but for this litigation.

64.     Because of Defendants excessive demands, the parties were unable to reach an agreement.

65.     Defendants' demand for a buyout made clear that they would not waive the noncompetes, and would act to enforce them, absent the exorbitant payment demanded for the

buyout. In a number of other cases, NAPA and its affiliates have sued to enforce the employment agreements when Hospitals have sought to employ their doctors. *See, e.g.*, *American Anesthesiology of N.J., P.C. et al. v. Cooperman Barnabas Med. Ctr. et al.*, No. ESX-L-004310-22 (Essex County Ct. 2023); *N. Am. Partners in Anesthesia (Maryland), LLC v. Mack et al.*, No. C-13-cv-23-000615 (Md. Cir. Ct. 2023); *N. Am. Partners in Anesthesia (Virginia), LLC v. Inova Health Care Servs.*, No. CL-2022-0004271 (Va. Cir. Ct. Fairfax County 2022); *Southeast Anesthesiology Consultants, PLLC et al. v. The Charlotte-Mecklenburg Hospital Authority et al.*, taken in order to maintain and enhanc

### Holy Cross' Actions and the Need for Litigation

66.     In order to avoid these staffing and payment problems, and because of its inability to obtain reasonable terms from Defendants, Holy Cross is therefore offering employment to the anesthesia providers working at its hospitals, effective on expiration of the Agreement on July 1, 2024.

67.     Holy Cross believes that most of the anesthesia providers would be interested in being employed by Holy Cross rather than to continue to be employed by Defendants.

68.     However, as described above, Defendants' noncompete agreements and the nonsolicitation clause in the parties' Agreement threaten to interfere with these choices. Defendants refuse to waive these provisions without payment of unreasonable and exorbitant buy out fees.

69.     If the noncompetes and nonsolicitation clause deterred the anesthesia providers from accepting Holy Cross offers of employment, this would force Holy Cross into an untenable dilemma: pay exorbitant fees for anesthesia services or face a crippling shortage of anesthesia providers.

### Relevant Antitrust Service Markets

### Hospital-Only Anesthesia Services

70.     One relevant service market in which to assess the challenged conduct is the market for professional anesthesia services provided in community (nonacademic) hospitals. This service market includes services provided by anesthesiologists, CRNAs and AAs. It encompasses (1) all inpatient anesthesia services, including surgical and cardiac anesthesia performed while the patient is admitted to a hospital; and (2) any other anesthesia services that are provided in a hospital setting.

71.     The relevant market excludes anesthesia services that are provided outside a hospital setting. Non-hospital settings are not good substitutes for the surgical and cardiac procedures (most of the procedures requiring anesthesia) performed in hospitals, and as a result anesthesia services provided in a non-hospital setting are not a substitute for hospital-based anesthesia services.

72.     Whether a patient receives anesthesia in a hospital or nonhospital setting is not determined in any way by the cost of anesthesia providers. Patients receive surgery or heart procedures on an inpatient basis (requiring an overnight stay) based solely on the seriousness of the procedure and/or the characteristics of the patient (e.g. whether the patient is old, infirm or has comorbidities). Cases are only performed on an inpatient basis when that is viewed as medically required, because the cost of inpatient care is many times the cost of outpatient care. Moreover, anesthesia care, as described above, is a small fraction of the cost of the surgeries and other procedures for which anesthesia is necessary.

73.     Similarly, patients often receive outpatient surgery at the hospital rather than at an ambulatory surgery center or other nonhospital setting (even for procedures which are sometimes performed outside the hospital), because the patient's characteristics (age, infirmity or

comorbidities) make it medically prudent to have ready access to a hospital's emergency facilities and other backup services.

74.     Because the cost of anesthesia is only a small fraction of the cost of the procedures requiring anesthesia, no purchaser of anesthesia services would move a procedure from the hospital to non-hospital setting as a result of an increase in the price of anesthesia services.

75.     The Centers for Medicare and Medicaid Services ("CMS") maintain a list that distinguishes between hospital-only and other anesthesia services for governmentally insured patients. The list identifies anesthesia billing codes that may be used for ambulatory surgical centers. All other anesthesia codes must be billed in a hospital setting. Commercially insured patients generally face similar billing rules, either formally or because hospitals adopt CMS policy to remain certified for government insurance programs.

76.     Alternatively, the relevant market is the market for employment of anesthesia providers in hospitals.

77.     Hospital-only anesthesia services require providers to practice under conditions distinct from non-hospital services. Hospitals often need anesthesia providers to cover long shifts and provide overnight call. Unlike non-hospital procedures, which are scheduled in advance, procedures performed during overnight call are often hospital-only or inpatient services, such as anesthesia for emergency surgery.

78.     Anesthesia providers providing pain management services or working at outpatient centers such as ambulatory surgery centers are not reasonable substitutes for anesthesia providers working in the hospital. That is because hospital services require providers who are willing to undertake more intensive cases and be available on-call for unanticipated

cases. Many anesthesia providers working in the non-hospital outpatient setting are unwilling to undertake these additional duties and responsibilities.

79.     Additionally, ASCs generally pay more for anesthesia providers because they have more higher paying cases reimbursed at higher rates by commercial insurers. As a result, for this reason as well, anesthesia providers working in ASCs are not reasonably interchangeable with hospital-based providers. It would require higher than competitive payments that exceed the current compensation of ASC-based anesthesia providers to attract them to practice at hospitals. But hospitals, who do not enjoy as high a proportion of higher paying commercial cases, cannot afford to do so.

80.     Alternatively, even if the market were determined to include anesthesia providers at outpatient centers and ASCs, the numbers of such providers are too small to provide meaningful alternative sources of care for any hospital.

81.     For hospitals, anesthesia groups with insufficient size or scope to provide 24-hour coverage and specialty anesthesia services cannot be reasonable substitutes for anesthesia groups operating in hospitals, which require such services. Groups serving only ASCs or other outpatient facilities are generally not of that size and scope.

## Other Relevant Markets

82.     Another relevant service market in this case is the market for facilities offering inpatient surgical services to commercially insured patients. This market encompasses a broad cluster of inpatient surgical services, including orthopedics, general surgery, cardiac and vascular surgery, urological surgery, spinal surgery, and neurosurgery. These services are offered to patients by the same set of hospital competitors and under similar competitive conditions.

83.     There is no substitute for inpatient services (which generally are defined to include at least one overnight stay in a hospital). Where an overnight stay is medically required,

outpatient services are not an acceptable alternative. Inpatient services are far more expensive, and as a result a procedure would not be done on an inpatient basis unless medically necessary.

84.     This market is a "cluster market", comprised of a number of different services, which do not necessarily substitute for one another. This group of services is typically defined as a cluster market in healthcare antitrust cases for convenience, because, the effects described herein apply equally to all these services.

85.     Another relevant service market in this case is the market for hospital facilities offering inpatient cardiac procedures to commercially insured patients. This market encompasses a cluster of cardiac procedures performed in the cardiac catheterization lab at a hospital, including diagnostic procedures (e.g., diagnostic cardiac catheterization and biopsy) and interventional procedures (e.g., TAVR and Watchmen procedures, balloon angioplasty, percutaneous coronary intervention), as well as electrophysiology procedures, such as atrial fibrillation ablations, and installation of pacemakers. For those patients whose medical conditions require these procedures, there are no reasonable substitutes for them. As a result, no managed care plan would offer insurance to patients that did not cover these procedures. These services are generally offered to patients by the same set of hospital competitors and under similar competitive conditions.

86.     Another relevant service market encompasses hospital outpatient surgical services provided to commercially insured patients. This includes outpatient procedures performed in hospital facilities as well as procedures performed in other hospital-owned facilities. This is another cluster market, since all the included services are affected equally by the conduct described herein.

87.     Many patients prefer to utilize their hospitals and their facilities for outpatient as well as inpatient services because they know and trust the hospital brand. Many physicians located on hospital campuses prefer to refer their patients needing outpatient services to facilities on those campuses for convenience, and often prefer to refer their patients to hospital-owned facilities because they share common electronic medical records with the hospitals. It is also more convenient and efficient for physicians to perform their surgeries, including their outpatient surgeries, at the same locations as their inpatient surgeries.

88.     As a result, non-hospital facilities are not a substitute for hospitals for outpatient surgical care in health plans' networks. Health plan networks need to include hospital outpatient surgical facilities in their networks to appeal to the significant number of patients who prefer those facilities, especially since employers seek networks which satisfy as many of their employees as possible. No health plan in Broward County has excluded hospital outpatient surgical services from a network in favor on non-hospital services.

89.     One study found that ASC entry did not have a significant impact on hospitals' outpatient surgical volume, indicating that patients do not see surgeries at ASCs as a substitute for surgeries at hospitals. Another study found that hospitals obtained much larger price increases than ASCs for the same outpatient procedures between 2007 and 2012. According to another study, outpatient procedures and services delivered in hospitals are often reimbursed at a higher rate than those delivered at a non-hospital setting.

90.     All of the service markets described above apply to services provided to commercially insured patients, because health care services provided to commercially insured patients are in a distinct market from those services when provided to other patients. Most insured consumers of health care are covered either by one of two government insurance

24

programs (Medicare and Medicaid) or by private insurance organizations. The relevant markets do not include services paid for by Medicare or Medicaid, because these government programs fix their fees and therefore do not compete for these services. A hospital could not increase its volume or revenue by persuading patients to sign up for Medicare or Medicaid, because enrollment in these programs is limited to the elderly, disabled or underprivileged. Medicare and Medicaid typically pay significantly lower rates than do commercial insurers and, therefore, are not an alternative to them.

**<u>Relevant Geographic Market for Anesthesia</u>**

91.     The relevant service markets described above are local. Because patients typically seek medical and hospital care close to home, they strongly prefer health insurance plans that provide access to networks of hospitals and physicians close to home. Additionally, patients desire local hospitals that are in-network in their plan without financial penalties. Employers offering health insurance to their employees therefore demand insurance products that provide access to health care provider networks in all the areas in which substantial numbers of their employees live. Individuals purchasing individual health insurance likewise demand insurance products that provide access to health care provider networks, including hospitals, in the areas in which they live.

92.     The relevant geographic market for the purchase of hospital-based anesthesia services and employment of anesthesia providers is no larger than northeast Broward County, north of SR-84 and east of I-95. Traffic in the Broward County area is highly congested, and with the exception of travel on I-95, there are no highways that permit convenient travel either north and south or east and west. As a result, travel to a hospital from even 10 miles away will typically take 30 minutes, and potentially longer during rush hour. As a result, patients seek care in an extremely local area.

25

93.     Memorial Health Care System operates a substantial number of hospitals just south of SR-84. But Memorial has not placed any physicians' offices or other ambulatory facilities north of SR-84. That likely reflects a decision that while patients who reside north of SR-84 may see a physician at an office north of SR-84, such patients are unlikely to travel to obtain hospital care at a Memorial site south of SR-84, even if referred there by his or her Memorial physician, because travel to such a site is not convenient for the patient.

94.     For the same reasons, there are a number of HCA hospitals west of I-95. But HCA has not invested in ambulatory sites east of I-95, likely in recognition of the fact that patients will not travel west across I-95 in significant numbers for hospital care.

95.     These factors relating to traffic congestion are particularly important to physicians and other medical staff practicing in hospitals, such as anesthesia providers. Those providers not only need to travel every day to the hospital, but often need to be on call to quickly reach the hospital in the event of emergencies. This means that traffic congestion and travel time are especially significant in limiting the distances that anesthesia providers will be willing to travel in order to provide hospital care. For this reason, a hospital located in northeast Broward County would be unable to attract a sufficient number of anesthesia providers to adequately staff the hospital if it relied upon anesthesia providers residing outside of that area.

96.     Hospitals select anesthesia groups for hospital contracts in northeast Broward County from groups with a significant portion of doctors within northeast Broward County. Practices currently employing primarily anesthesia providers outside northeast Broward County would be significantly less cost competitive in northeast Broward County due to the need to recruit, hire locum tenens physicians to fill in for staffing gaps on short notice, and provide travel and lodging for more distant providers, even assuming (which is highly unlikely) that they could

find sufficient numbers of willing providers. Anesthesia providers are generally unwilling to move to a distant community in order to provide anesthesia care, especially in light of the numerous options they possess given the shortage of providers nationwide. Given the large number of anesthesia providers needed by hospitals, outside practices are not reasonable substitutes for practices with substantial numbers of providers located in northeast Broward County.

97.     As a result, the available pool of anesthesia providers for northeast Broward County hospitals is largely limited to the providers located in northeast Broward County.

### Relevant Antitrust Geographic Market for Surgeries and Heart Procedures

98.     The relevant geographic market applicable to facilities offering inpatient and outpatient surgery and heart procedures is northeastern Broward County, north of I-84 and east of I-95. Because of the patient travel patterns described above, no managed care plan would offer a network to employers or individuals in northeastern Broward County that did not include hospitals located in that area. Only about 40% of Broward County patients obtaining surgery utilize facilities outside of northeastern Broward County. To satisfy the 60% who are unwilling to travel, managed care plans need to contract with facilities in northeast Broward County.

99.     A health insurer could not successfully sell health insurance products to employers with significant numbers of northeastern Broward County employees without including a choice of northeastern Broward County providers, including leading northeastern Broward County hospitals, in its network. As a result, there is no reasonable substitute for these hospitals for most patients in northeastern Broward County, for employers in northeastern Broward County or for managed care companies that offer their plans in northeastern Broward County.

### Market Power

27

100.     Providing hospital-only anesthesia requires postsecondary education, including either a graduate post-medical degree or nursing degree, in addition to training and licensing. As a result, the supply of anesthesia providers is limited and cannot be increased rapidly in response to market trends in demand or reimbursement rates.

101.     Recruitment of anesthesiologists is a slow process, requiring at least 12 to 18 months to successfully recruit an additional physician even where recruitment is possible. In addition, new anesthesia providers must spend time being oriented to the facility, equipment and surgeons or other proceduralists with whom they will work.

102.     Defendants have market power in the relevant market for anesthesia providers. The shortage of anesthesia providers, and the widespread existence of noncompetition clauses which makes anesthesia providers who are under contract unavailable, means that there is no or virtually no available capacity in the relevant anesthesia market. The only other hospital-based anesthesia providers in northeast Broward County are in Anesco, and are subject to noncompetes. As a result, Defendants are in a position to demand, and have demanded and obtained, rates higher than competitive levels because of the absence of any significant competition to which Holy Cross could turn for an alternative source of anesthesia care.

103.     Despite the fact that Holy Cross is forced to pay exorbitant rates to American Anesthesiology, American Anesthesiology's anesthesia providers are paid less than market rates by the group. This is a further indication of American Anesthesiology's market power.

**Anticompetitive Effects in the Relevant Anesthesia Markets**

104.     The noncompetes and nonsolicitation clause have caused and will continue to cause substantial anticompetitive effects in the relevant anesthesia markets, since they serve to stymie competition and increase rates and other terms of service. Enforcement of the noncompetes and nonsolicitation clause has and will continue to stymie Holy Cross' entry into

28

competition in the relevant anesthesia markets by employing anesthesiologists and providing anesthesia services at its hospital. Enforcement of the noncompetes and nonsolicitation clause has therefore (and would in the future) created and maintained Defendants' market power.

105.    The noncompetes and nonsolicitation clause are also unreasonable and harmful to competition because they interfere with patient choice, and prevent Holy Cross physicians from utilizing their preferred anesthesiologists with whom they have developed long, successful working relationships.

106.    The noncompetes also prevent entry by other firms offering anesthesia services into the relevant market. There are many other firms nationwide that offer anesthesia services. But in order to offer services in a given local area, an anesthesia provider needs to be able to hire anesthesia providers who live in that area, since most anesthesia providers will not be willing to uproot their families and move to a distant city in order to continue to practice. Because the Defendants' anesthesia providers are precluded from becoming employed by other firms because of their noncompetes, entry into Broward County by other firms providing anesthesia care is effectively prohibited.

107.    The Federal Trade Commission's recent Notice of Proposed Rule Making with regard to a proposed rule to prohibit many noncompetition clauses provides evidence that physician noncompetition clauses can be significantly anticompetitive:

> [T]here is evidence non-compete clauses increase consumer prices and concentration in the health care sector.
>
> *          *          *
>
> [N]on-compete clauses foreclose the ability of competitors to access talent by effectively forcing future employers to buy out workers from their non-compete clauses if they want to hire them. Firms must either make inefficiently high payments to buy workers out of non-compete clauses with a former employer, which leads to deadweight economic loss, or forego the payment—and,

50990237.22

> consequently, the access to the talent the firm seeks. Whatever choice a firm makes, its economic outcomes in the market are harmed, relative to a scenario in which no workers are bound by non-compete clauses.

108.    The FTC's analysis applies precisely here. The enforcement of the noncompetes will force Holy Cross to make artificially and inefficiently high payments to buy the anesthesiologists out of the noncompete clauses, pay exorbitant amounts to Defendants for inadequate services or forego access to these providers. This would create highly anticompetitive outcomes.

109.    Holy Cross is a direct target of Defendants' actions. Defendants intend to enforce the noncompetes and nonsolicitation clause in order to prevent Holy Cross from challenging Defendants' market power in the relevant anesthesia markets. The harm to Holy Cross is inextricably intertwined with this injury.

110.    Defendants are only taking their anticompetitive actions because their market power gives them the ability to make these actions effective, and that same market power gives them the incentive to enforce the clauses in order to prevent further competition. Enforcement of the noncompetes and nonsolicitation clause would not be effective in restricting competition or allowing Defendants to make exorbitant payment demands unless Defendants had market power.

111.    If it were not for Defendants' market power, they would not have the ability to effectively threaten enforcement of the noncompetes absent an exorbitant payment. They were able to make this demand and threat because they knew that Holy Cross does not have alternatives to the anesthesia providers employed by Defendants. But for Defendants' market power and the anticompetitive effects identified herein, enforcement of the noncompetes and nonsolicitation clause would not cause the substantial damages alleged in this Complaint.

112.     Moreover, given the absence of any legitimate basis for the noncompetes or nonsolicitation clause, Defendants would not have an interest in enforcing the noncompete and nonsolicitation clause absent the market power and anticompetitive effects outlined herein.

113.     Because of their enforcement of the noncompetes, Defendants have been able to harm Holy Cross, by demanding and receiving exorbitant and uncompetitive terms for the services they provide as outlined above. This exercise of market power has been made possible because of the noncompetes and nonsolicitation clause and Defendants' willingness to enforce them if necessary. If this enforcement continues, this exercise of market power will continue, because Holy Cross will have no real choice except to succumb to Defendants' demands.

**Anticompetitive Effects in the Relevant Surgery and Heart Procedure Markets**

114.     Enforcement of the noncompetes and nonsolicitation clause would also have significant anticompetitive effects in the relevant surgery and cardiac procedures markets. If Holy Cross ended its relationship with American Anesthesiology in order to obtain more reasonably priced and better staffed anesthesia services, and the noncompete clause and nonsolicitation clause were enforced, that would have the anticompetitive effect of diverting the vast majority of surgeries and cardiac procedures from Holy Cross,

115.     There are only two competing hospital entities of any significance in the markets for surgeries and heart procedures, Broward Health and Holy Cross. As a result, if American Anesthesiology were to cease providing services at Holy Cross, Broward Health would increase its market share so that it would have a virtually complete monopoly in these services.

116.     Numerous academic studies have concluded that when hospital markets become highly concentrated, with fewer competitors and higher market shares, prices generally increase.

a.     A 2011 study examined the effect of hospital market concentration on specific procedures. It found that in concentrated hospital markets,

31

hospitals charged 29% more for cervical fusion, 31% more for lumbar fusion, 45% more for total knee replacement, 49% more for total hip replacement, 50% more for angioplasty, and 56% more for CRM device insertion. James C. Robinson, *Hospital Market Concentration, Pricing, Profitability in Orthopedic Surgery and Interventional Cardiology,* 117(6) THE AM. J. OF MANAGED CARE e241, e244 (2011).

b.   Another 2011 study examined the effect of concentrated hospital markets on hospital prices in 2001 and 2004. It concluded that "hospital prices are higher in more concentrated markets" and that a "1,000-percentage-point increase in the hospital concentration index raises prices by approximately 8.3 percent." Glenn A. Melnic, Yu-Chu Shen and Vivian Yaling Wu, *The Increased Concentration of Health Plan Markets Can Benefit Consumers through Lower Hospital Prices,* 30(9) Health Affairs 1728, 1729-31 (2011).

c.   Another study of hospital mergers found that "[i]ncreases in hospital market concentration lead to increases in the price of hospital care." Martin Gaynor and Robert Town, The Impact of Hospital Consolidation—*Update,* Robert Wood Johnson Foundation, THE SYNTHESIS PROJECT (June 2012) at 1.

117.   Enforcement of the noncompetes and nonsolicitation clause would also harm competition because it would require patients to forego the choice of care at Holy Cross, despite its extremely high quality services in surgery and cardiology procedures described above, all of which make it a very significant competitor in the relevant markets. Diversion of cases away

from Holy Cross would deprive patients of the opportunity to benefit from these high quality services and suppress quality competition.

118.   This harm to competition in the relevant surgery and heart procedure markets is inextricably intertwined with Defendants' demands. That is because Holy Cross faces a "Hobson's choice." If it gives in to those demands, it would be forced to pay exorbitant rates for inadequate anesthesia staffing. If it does not, the noncompetes and nonsolicitation clauses would cause it to lose its only source of substantial anesthesia care, and therefore the loss of surgeries, heart procedures and other procedures described above. Its damages would also reflect the anticompetitive effects of Defendants' actions, because of the significant decrease in competition in these relevant markets that would result.

119.   In fact, Defendants intend that Holy Cross face this Hobson's choice. Their leverage, and their ability to make unreasonable demands, arises because they know that the noncompetes and nonsolicitation clause preclude Holy Cross from having any reasonable alternative source of anesthesia providers. Therefore, Holy Cross is forced to either accept Defendants' demands or suffer significant loss of procedures requiring anesthesia.

**Defendants' Noncompete Agreements and the Nonsolicitation Clause Do Not Provide Any Procompetitive Benefits and Do Not Serve a Reasonable Business Interest**

120.   Defendants' noncompete agreements with American Anesthesiology's providers do not serve any reasonable or legitimate business interest. They do not serve to protect any confidential information possessed by these providers, since none of the information possessed by them is at all confidential to Defendants. Defendants have not taken any steps to keep any information confidential. Defendants also have not claimed to Holy Cross personnel that any of their information is confidential. Nor does the Agreement purport to protect (or even address) the confidentiality of any information possessed by American Anesthesiology or other Defendants.

121.    Defendants do not possess any unique customer information or goodwill. The patients the anesthesia providers see are provided by the hospital. Defendants do not advertise their providers' services to prospective patients. Nor do they keep any confidential patient lists or have any hospital patients of their own.

122.    Defendants do not provide their anesthesia providers with significant specialized training. The anesthesia providers all received specialized training before becoming employed by Defendants. Many of the providers were employed by other firms before NAPA took over the Holy Cross practice.

123.    Nor do the anesthesia providers possess any trade secrets. Defendants do not utilize any proprietary systems at Holy Cross. Scheduling is performed by Holy Cross. Defendants provide their services using industry standard technology. Defendants utilize scheduling software, but anesthesia scheduling software products are readily available for sale and St. Joseph's affiliates at Trinity Health already utilize such products.

124.    There are no procompetitive justifications for Defendants' actions. Even assuming, *arguendo*, and contrary to the allegations above, that the noncompetes provided some benefits to Defendants, they would not create any procompetitive effects in the relevant markets.

125.    For these reasons, while noncompetition clauses are common in physician contracts involving other specialties to protect against unfair appropriation of patient relationships, those justifications do not apply at all to anesthesia providers.

126.    All these conclusions apply equally to the nonsolicitation clause. Defendants' significant and repeated breaches of the Agreement's requirements regarding anesthesia staffing are among the reasons why Holy Cross has found it necessary to seek to employ the anesthesia providers.

50990237.22

127.     Harm to Holy Cross from the enforcement of the noncompetes and nonsolicitation clause would be far less than the harm that Defendants would suffer if they were not able to employ these physicians. That is because (as described above) revenues involved in hospital treatment of patients for cases requiring anesthesia care far exceeds the revenues that involved in anesthesia care.

### COUNT I
### UNLAWFUL AGREEMENT IN VIOLATION OF
### SHERMAN ACT § 1
### Relevant Anesthesia Markets

128.     Holy Cross repeats and realleges the allegations of paragraphs 1 through 81, 91 through 97 and 100 through 127 above, as if fully restated herein.

129.     Each of the noncompete agreements between Defendants and their anesthesia providers, as well as the nonsolicitation clause, is a contract, combination, and conspiracy within the meaning of the Section 1 of the Sherman Act, 15 U.S.C. § 1.

130.     Defendants possess significant market power in the relevant anesthesia markets. This is demonstrated by their high market share, the high barriers to entry into the market, and Defendants' ability to exclude competition by the use of their noncompetes and nonsolicitation clauses.

131.     The noncompete clauses and nonsolicitation clause have had, and if further enforced would continue to have, substantial and unreasonable anticompetitive effects in the relevant anesthesia markets as set forth above.

132.     The noncompete agreements and nonsolicitation clause therefore have, and threaten to continue to, unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

133.     As a direct and proximate result of Defendants' actual and threatened violations of Section 1 of the Sherman Act and the anticompetitive effects thereof, Holy Cross has suffered and would continue to suffer substantial harm to its business and property.

## COUNT II
## UNLAWFUL AGREEMENT IN VIOLATION OF
## SHERMAN ACT § 1
## Relevant Surgery and Cardiac Procedure Markets

134.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 127 above, as if fully restated herein.

135.     Each of the noncompete agreements between Defendants and their anesthesia providers, as well as the nonsolicitation clause, is a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

136.     Enforcement of the noncompete clauses and nonsolicitation clause have caused and threaten to cause substantial and unreasonable anticompetitive effects in each of the relevant surgery and cardiac procedures markets in Broward County as set forth above.

137.     The noncompete agreements and nonsolicitation clause therefore threaten to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

138.     As a direct and proximate result of Defendants' actual and threatened violations of Section 1 of the Sherman Act and the anticompetitive effects thereof, Holy Cross has suffered and would continue to suffer substantial harm to its business and property.

## COUNT III
## VIOLATION OF FLORIDA ANTITRUST ACT

139.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 138 above, as if fully restated herein.

140.    Defendants' actions occurred in and substantially affected Florida's intrastate commerce, involving services provided by Florida anesthesia providers, hospitals and doctors to patients in Florida.

141.    Defendants' actions violate and threaten to continue to violate the Florida Antitrust Act, Fla. Stat. §542.18.

<u>**COUNT IV**</u>
<u>**REQUEST FOR DECLARATORY JUDGMENT UNDER FLORIDA LAW**</u>

142.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 69 and 120 through 127 above, as if fully restated herein.

143.    In order to prove that a noncompete covenant or nonsolicitation clause is enforceable under Florida law, Defendants must show the clause is reasonably necessary to protect a legitimate business interests, including trade secrets, customer or patient relationships or extraordinary or specialized training. Additionally, the clause must be otherwise reasonable. Fla. Stat. §542.335(1). The noncompete and nonsolicitation clauses do not meet any of these requirements. They serve no purpose except to restrict competition and provide Defendants with market power. They are therefore unenforceable pursuant to Fla. Stat. § 542.335(1)(b).

144.    Additionally, and for the same reasons, Defendants are precluded from any claim under the nonsolicitation clause pursuant to Fla. Stat. § 542.335(1)(b), as well as by virtue of their breaches of the Agreement as set forth above.

<u>**COUNT V**</u>
<u>**BREACH OF CONTRACT**</u>

145.    Holy Cross repeats and realleges the allegations of paragraphs 1 through 69 above, as if fully restated herein.

146.    Defendants' staffing failures described above constitute a breach of the Agreement, which has damaged Holy Cross.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

a.  Require that Defendants release their employees practicing at Holy Cross from any restrictions on their employment by Holy Cross;

b.  Issue a declaratory judgment finding that Defendants' noncompetition clauses and the nonsolicitation clause in the Agreement violate federal and Florida antitrust laws to the extent that they are utilized to prevent the anesthesia providers from becoming employed by Holy Cross;

c.  Issue a declaratory judgment finding that Defendants' noncompetition clauses in their agreements with their anesthesia providers and the nonsolicitation clause in the Agreement are unreasonable and do not serve any legitimate business interest, and are therefore unenforceable under Florida law;

d.  Grant Holy Cross three times its damages suffered as a result of Defendants' exploitation of their market power resulting from their use of the noncompetes and nonsolicitation clause;

e.  Grant Holy Cross its damages suffered as a result of Defendants' breach of contract;

f.  Award Holy Cross its taxable costs and reasonable attorneys' fees; and

g.  Grant such other relief as this Court finds just.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: February 26, 2024              s/Peter R. Goldman
                                      Peter R. Goldman (FL Bar No. 86056)
                                      Nelson Mullins Riley & Scarborough LLP

100 S.E. 3rd Ave., Suite 2700
Fort Lauderdale, FL 33394
(954) 745-5239 (p)
(954) 761-8135 (f)
peter.goldman@nelsonmullins.com

s/David A. Ettinger

David A. Ettinger (P26537) (subject to pro hac
application/admission)
Benjamin VanderWerp (P84614) (subject to pro
hac application/admission)
Honigman LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
(313) 465-7368 (p)
(313) 465-7369 (f)
dettinger@honigman.com
bvanderwerp@honigman.com

39

50990237.22