IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| HOLY CROSS HOSPITAL, INC., ) | |
| ) | Civil Action No.: 0:24-cv-60315-AHS |
| Plaintiff/Counter-Defendant, ) | |
| ) | |
| v. ) | |
| ) | |
| AMERICAN ANESTHESIOLOGY ) | |
| SERVICES OF FLORIDA, INC., ) | |
| AMERICAN ANESTHESIOLOGY, INC., ) | |
| NMSC II, LLC and NORTH AMERICAN ) | |
| PARTNERS IN ANESTHESIA, L.L.P., ) | |
| ) | |
| Defendants/Counterclaim- ) | |
| Plaintiffs. ) | |
| ) | |
| AMERICAN ANESTHESIOLOGY ) | |
| SERVICES OF FLORIDA, INC., ) | |
| ) | |
| Counterclaim-Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| HOLY CROSS HOSPITAL, INC., ) | |
| ) | |
| Counterclaim-Defendant. ) | |
| ) | |

**HOLY CROSS' MOTION TO DISMISS SECOND AMENDED COUNTERCLAIMS AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Federal Rules of Civil Procedure 1 and 12(b)(1), (b)(2), and (b)(6), Plaintiff/Counterclaim-Defendant Holy Cross Hospital, Inc. ("Holy Cross") moves to dismiss Defendants' Counterclaims, which are incorporated in their Second Amended Answer to Plaintiff's Complaint and Counterclaims ("Second Amended Counterclaims") (ECF No. 36) ("SAC").

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................... i

TABLE OF AUTHORITIES ...................................................................................................... iii

MEMORANDUM OF LAW ........................................................................................................1

I.       INTRODUCTION ............................................................................................................1

II.      ALLEGATIONS ..............................................................................................................1

III.     THE COUNTERCLAIMS SHOULD BE DISMISSED .....................................................2

       A.      Legal Standard for Motion To Dismiss ................................................................2

       B.      The Breach of Contract Claim Should Be Dismissed............................................3

              1.      The SAC Does Not Allege Facts Supporting the Existence of a Legitimate Business Interest ................................................................4

                     a.      The SAC's Allegations Regarding "Relationships" and "Goodwill" Are Inadequate ..........................................................4

                     b.      The SAC's Allegations Regarding Training and Recruiting are Inadequate ...................................................................8

                            (i)      Training.........................................................................8

                            (ii)     Recruiting...................................................................10

              2.      American Anesthesiology Failed to Allege That a Non-Solicitation Clause Is Reasonably Necessary to Protect a Legitimate Business Interest.........................................................................11

              3.      These Failures are Fatal to the Breach of Contract Claim .........................12

       C.      American Anesthesiology's Tortious Interference Claim Should Be Dismissed............................................................................................................13

              1.      The SAC Does Not Allege Interference with Any Legal Rights...............13

               2.      There Are No Allegations of Unjustified Interference ..............................14

               3.      The SAC Makes Clear that Holy Cross Is Not a "Stranger to the Relationship".........................................................................................16

               4.      There Are No Allegations of Specific Intent ...........................................18

IV.     CONCLUSION......................................................................................................................18

ii

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*ADT LLC v. Vivant Smart Home, Inc.*,
Case No. 20-23391-CIV, 2021 WL 4478932 (S.D. Fla. Sept. 30, 2021) ...............................16

*Am. United Life Ins. Co. v. Martinez*,
480 F.3d 1043 (11th Cir. 2007) ............................................................................................3

*Beck v. Lazard Freres & Co., LLC*,
175 F.3d 913 (11th Cir. 1999) ..............................................................................................3

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................................3

*Big Ligas, LLC v. Yu*,
Case No. 20-23719-CIV, 2021 WL 1518993 (S.D. Fla. Apr. 16, 2021) ...............................17

*Blue-Grace Logistics LLC v. Fahey*,
653 F.Supp.3d 1172 (M.D. Fla. 2023)................................................................................3, 8

*Bryan Media, Inc. v. City of St. Petersburg*,
Case No. 8:05-CV-291-T-MSS, 2006 WL 8440094 (M.D. Fla. Dec. 11, 2006),
*aff'd*, 293 F. App'x 717 (11th Cir. 2008)........................................................................15, 18

*Buccellati Holding Italia SPA v. Laura Buccellati, LLC*,
No. 13-21297-CIV, 2014 WL 11880856 (S.D. Fla. Jan. 3, 2014)..........................................3

*Calderon v. Sixt Rent a Car, LLC*,
Case No. 19-CV-62408, 2020 WL 700381 (S.D. Fla. Feb. 12, 2020), *aff'd*, 5
F.4th 1204 (11th Cir. 2021) ................................................................................................1

*Chaparro v. Carnival Corp.*,
693 F.3d 1333 (11th Cir. 2012) ............................................................................................3

*Columna, Inc. v. Aetna Health, Inc.*,
Case No. 19-80522-CIV, 2019 WL 4345675 (S.D. Fla. Sept. 12, 2019) ...............................17

*Concierge Servs., Inc. v. Flagler Holdings VI Beta Inc.*,
Case No. 21-20746-CIV, 2021 WL 3934225 (S.D. Fla. May 27, 2021)...............................17

*Duty Free Americas, Inc. v. Estee Lauder Cos.*,
797 F.3d 1248 (11th Cir. 2015) ....................................................................................14, 15

*Ebbeskov Jankovic, LLC v. Johansen*,
Case No. 21-cv-62410, 2022 WL 3681930 (S.D. Fla. May 6, 2022).....................................12

iii

*Grandis v. BGIS Global Integrated Solutions US LCC,*
    643 F. Supp. 3d 1340 (S.D. Fla. 2022) ..................................................................................2

*Hvide v. Holt Fin. Ltd.,*
    Case No. 20-22266-CIV, 2021 WL 8154846 (S.D. Fla. Sept. 13, 2021) ...............................17

*IDMWORKS, LLC v. Pophaly,*
    192 F. Supp. 3d 1335 (S.D. Fla. 2016) ...................................................................................9

*Ingenuity, Inc. v. Linshell Innovations Ltd.,*
    Case No. 6:11-cv-93, 2014 WL 1230695 (M.D. Fla. Mar. 25, 2014), *aff'd*, 644
    F. App'x 913 (11th Cir. 2016)........................................................................................15, 18

*Int'l Sales & Serv., Inc. v. Austral Insulated Prods. Inc.,*
    262 F.3d 1152 (11th Cir. 2001) ............................................................................................13

*Lake Gateway Motor Inn, Inc. v. Matt's Sunshine Gift Shops, Inc.,*
    361 So. 2d 769 (Fla. 4th DCA 1978) ...................................................................................13

*Palm Beach Cnty. Health Care Dist. v. Pro. Med. Educ., Inc.,*
    13 So. 3d 1090 (Fla. 4th DCA 2009) ..............................................................................16, 17

*Passalacqua v. Naviant, Inc.,*
    844 So. 2d 792 (Fla. 4th DCA 2003) .....................................................................................5

*Plain Bay Sales, LLC v. Gallaher,*
    Case No. 18-CV-80581, 2019 WL 6206836 (S.D. Fla. Nov. 21, 2019)................................13

*Properties of Villages, Inc. v. Kranz,*
    Case No. 5:19-cv-647, 2020 WL 6270932 (M.D. Fla. Aug. 14, 2020), *R&R
    adopted*, Case No. 19-cv-647, 2020 WL 5939942 (M.D. Fla. Oct. 7, 2020) .......................5, 8

*Proudfoot Consulting Co. v. Gordon,*
    576 F.3d 1223 (11th Cir. 2009) ..............................................................................................8

*Rauch, Weaver, Norfleet, Kurtz & Co. v. AJP Pine Island Warehouses, Inc.,*
    313 So. 3d 625 (Fla. 4th DCA 2021) ......................................................................................4

*Register v. Pierce,*
    530 So.2d 990 (Fla. 1st DCA 1988) .....................................................................................13

*Resouluna 4840, LLC v. Palceski,*
    2019 WL 7482222 (M.D. Fla. Sept. 5, 2019) .........................................................................9

*U.S. Alliance Management Corp. v. Airbus Americas Customer Servs., Inc.,*
    Case No. 19-cv-24066, 2020 WL 13613823 (S.D. Fla. Jan. 30, 2020) ..................................13

*University of Florida, Board of Trustees v. Sanal*,
    837 So. 2d 512 (Fla. 1st DCA 2003) ........................................................................5

*Vanderberg v. Donaldson*,
    259 F.3d 1321 (11th Cir. 2001) ..............................................................................18

*Vessels v. Dr. Terrazzo of Fla., LLC*,
    352 So.3d 946 (Fla. 5th DCA 2022) ........................................................................9

*Vital Pharms., Inc. v. Alfieri*,
    23 F.4th 1282 (11th Cir. 2022) ............................................................................4, 5

*White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*,
    226 So. 3d 774 (Fla. 2017)............................................................................6, 8, 11

**STATUTES**

Fla. Stat. § 542.335 ...........................................................................4, 6, 8, 9, 11, 14

Rule 12(b)(6).........................................................................................................2, 3

<u>**MEMORANDUM OF LAW**</u>

**I.    <u>INTRODUCTION</u>**

This is the second effort by American Anesthesiology Services of Florida, Inc. ("American Anesthesiology") to draft viable counterclaims. Plaintiff/Counterclaim-Defendant Holy Cross Hospital, Inc. ("Holy Cross") moved to dismiss American Anesthesiology's original counterclaims because, among other reasons, American Anesthesiology failed to allege sufficient facts in support of its claims. (ECF No. 25.) American Anesthesiology's Second Amended Counterclaims (ECF No. 36) ("SAC") attempts to address this issue, but its allegations are entirely conclusory and are still inadequate to support its claims.[1] Indeed, the SAC includes many factual allegations which are inconsistent with its claims.

The SAC therefore fails to state a claim as a matter of law. After two failed attempts, it should be dismissed with prejudice.

**II.   <u>ALLEGATIONS</u>**

The key factual allegations in the SAC are as follows.[2] Holy Cross and American Anesthesiology entered into an Administrative and Clinical Services Agreement, which was effective May 1, 2021 (the "Agreement"). The Agreement established an exclusive services arrangement between Holy Cross and American Anesthesiology for the provision of anesthesia services for Holy Cross's patients. (ECF No. 36, SAC ¶5.) The Agreement's original term expired

---

[1] American Anesthesiology filed the SAC, on May 10, pursuant to stipulation, because Defendants' First Amended Answer to Plaintiff's Complaint and Counterclaims (ECF No. 33) misstated American Anesthesiology's name. *See* Joint Stipulation Regarding Defendants' Second Amendment of Pleadings (ECF No. 35). The SAC is otherwise identical to ECF No. 33.

[2] Although Holy Cross disputes certain allegations contained in the SAC, these facts are taken as true solely for purposes of this motion to dismiss. *See Calderon v. Sixt Rent a Car, LLC*, Case No. 19-CV-62408, 2020 WL 700381, at *1 n.1 (S.D. Fla. Feb. 12, 2020), *aff'd*, 5 F.4th 1204 (11th Cir. 2021).

on April 30, 2023, which could be renewed for a year by mutual written agreement. (*Id.* ¶6.) Via multiple amendments, the Agreement term was extended to June 30, 2024. (*Id*. ¶¶10-13.)

Pursuant to the Agreement, American Anesthesiology agreed to provide qualified providers. (Exhibit A, Administrative and Clinical Services Agreement, at p. 8.)[3] Holy Cross agreed to pay an annual amount "[i]n consideration for the staffing and provision of Anesthesia Services[.]" (*Id.*)

The Agreement also included a non-solicitation clause, Section XI.C (the "Non-Solicitation Clause"), that states:

> During the Term of this Agreement and for one (1) year thereafter, Hospital will not directly or indirectly, whether as an individual, advisor, employee, agent, or otherwise take any action to induce any employee to cease his or her employment or engagement with Group.

ECF No. 36, SAC ¶7.

On December 29, 2023, Holy Cross informed American Anesthesiology that it would not renew the Agreement. (ECF No. 36, SAC ¶30.) On February 26, 2024, Holy Cross announced to its medical staff via email its intention "to offer employment to American Anesthesiology's anesthesia providers," delivered offer letters to American Anesthesiology's anesthesiologists and CRNAs, and filed its complaint. (*Id.* ¶¶31-32.)

## III.   THE SAC SHOULD BE DISMISSED

### A.    Legal Standard for Motion To Dismiss

---

[3] This Court may consider the Agreement in the context of this Rule 12(b)(6) motion because it is repeatedly referenced in the SAC (*see* ECF No. 36, SAC ¶¶1, 5-8, 10-14, 18, 22, 30-35, 38-40, 42-43) and central to those claims, and the authenticity of the documents is not challenged. *See Grandis v. BGIS Global Integrated Solutions US LCC*, 643 F. Supp. 3d 1340, 1344 (S.D. Fla. 2022). Since American Anesthesiology did not attach the Agreement to the SAC, it is attached here.

The SAC must be judged based on the *facts* it alleges. "A complaint that provides 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action' is not adequate to survive at Rule 12(b)(6) motion to dismiss." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The "factual allegations must be enough to raise a right to relief above the speculative level" and must be sufficient "to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 555. Courts must review the complaint in the light most favorable to the plaintiff and must generally accept the plaintiff's well-pleaded facts as true. *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007). However, "if allegations are indeed more conclusory than factual, then the court does not have to assume their truth." *Chaparro*, 693 F.3d at 1337 (11th Cir. 2012). "A motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6) is evaluated in the same manner as a motion to dismiss a complaint." *Buccellati Holding Italia SPA v. Laura Buccellati, LLC*, No. 13-21297-CIV, 2014 WL 11880856, at *2 (S.D. Fla. Jan. 3, 2014).

**B.    <u>The Breach of Contract Claim Should Be Dismissed</u>**

The SAC does not allege facts which satisfy the requisite elements of a breach of contract claim relating to a restrictive covenant such as the non-solicitation clause. To succeed on a breach of contract claim under Florida law, a plaintiff must show: (1) a valid contract, (2) a material breach, and (3) damages. *See Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999).[4] "Restrictive covenants are generally unenforceable under Florida law as restraints on trade." *Blue-Grace Logistics LLC v. Fahey*, 653 F.Supp.3d 1172, 1178 (M.D. Fla. 2023). Under Florida law, "[w]hen a breach-of-contract action is based upon enforcement of a restrictive

---

[4] The Agreement specifies that it is governed by the laws of Florida (*see* Exhibit A, Administrative and Clinical Services Agreement, at p. 25), and the conduct alleged in American Anesthesiology's claims occurred in Florida.

covenant, . . . the plaintiff must plead and prove additional elements in order to establish that the restrictive covenant is a valid restraint of trade." *Rauch, Weaver, Norfleet, Kurtz & Co. v. AJP Pine Island Warehouses, Inc.*, 313 So. 3d 625, 630 (Fla. 4th DCA 2021) (citing Fla. Stat. § 542.335 (2014)). A party seeking to enforce a restrictive covenant must "plead and prove" (1) the existence of one or more legitimate business interests justifying the restrictive covenant, and (2) that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction. *Id.* (citing Fla. Stat. § 542.335(1)(a)-(c)). "Any restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable." Fla. Stat. § 542.335(1)(b). The SAC does not allege facts plausibly indicating the existence of a "legitimate business interest".

  1. **The SAC Does Not Allege Facts Supporting the Existence of a Legitimate Business Interest**

    a. **The SAC's Allegations Regarding "Relationships" and "Goodwill" Are Inadequate**

American Anesthesiology alleges, in conclusory fashion, that the Non-Solicitation Clause protects "relationships with its existing customers, patients, and clients" and "goodwill" that arises from those relationships (ECF No. 36, SAC ¶¶15-16). But this is inadequate. Although "substantial relationships with specific prospective or existing customers, patients, or clients" may constitute a legitimate business interest, *see* Fla. Stat. § 542.335(1)(b)(2)(3), American Anesthesiology has not adequately alleged facts setting forth a relationship between its providers and their patients.

For starters, "Florida treats relationships with customers as legitimate business interests only when those relationships are 'substantial' and with "*specific* prospective or existing customers.'" *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1291 (11th Cir. 2022) (emphasis in original). Therefore, "a party seeking enforcement of a restrictive covenant cannot rely on customer relationships as a legitimate interest unless the party 'plead[s] and prove[s]' the identity

of specific customers and the substantiality of the relationship with those customers." *Id.* (finding that district court abused its discretion when it found that party could rely on general customer relationships to establish a legitimate business interest); *see also Passalacqua v. Naviant, Inc.*, 844 So. 2d 792, 796 (Fla. 4th DCA 2003) (vacating a preliminary injunction predicated on the defendants' solicitation of the plaintiff's customers because "not one such customer was named in the complaint, the motion[,] or any exhibits filed"); *University of Florida, Board of Trustees v. Sanal*, 837 So. 2d 512, 516 (Fla. 1st DCA 2003) (finding that a legitimate business relationship with a prospective patient "must be, in addition to 'substantial,' one with a particular, identifiable, individual").

The SAC fails to meet this basic test. American Anesthesiology fails to identify any specific "customers" or "patients" or other relationships. Nor does it identify which anesthesia providers have such relationships. If, for example, Dr. Smith has such a relationship, but Dr. Jones does not, then there is certainly no basis for prohibiting solicitation of Dr. Jones. "Generic allegations do not establish legitimate business interest." *Properties of Villages, Inc. v. Kranz*, Case No. 5:19-cv-647, 2020 WL 6270932, at *8 (M.D. Fla. Aug. 14, 2020), *R&R adopted*, Case No. 19-cv-647, 2020 WL 5939942 (M.D. Fla. Oct. 7, 2020).

Moreover, American Anesthesiology identifies the wrong relationships. It alleges that "[t]he physicians and other professionals practicing at Holy Cross are [American Anesthesiology's] 'customers'" (ECF No. 36, SAC ¶19). But this allegation makes no sense and deserves no weight. The common dictionary definition of "customer" is "one that purchases a commodity or service." *See* Merriam-Webster.com.[5] American Anesthesiology does not allege that the surgeons pay American Anesthesiology for services, or that they are patients receiving the

---

[5] Available at https://www.merriam-webster.com/dictionary/customer.

anesthesia services. There are no allegations in the SAC of any relationships between anesthesia providers and their patients.

American Anesthesiology apparently intends to argue that surgeons and other physicians performing procedures make the decisions on the choice of anesthesia providers for their patients. But that would still not make them "customers, patients or clients" within the meaning of the statute. As the Florida Supreme Court explained in *White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So. 3d 774, 786 (Fla. 2017), while referral relationships are not identified as legitimate business interests in Fla. Stat. § 542.335, "an interest in referral sources for specialist physicians may be a legitimate business interest, thus capable of protection in some circumstances and unprotected in others." "Certain industries, such as home health services, present special facts where protecting referral sources may be necessary to prevent unfair competition." But no such "special facts" are alleged here. *Id.*

Significantly, in *White*, the Florida Supreme Court based its conclusion on evidence that referrals from physicians were the "lifeblood" of a home health business, *id.* and were a home health company's "most important business asset." 226 So. 3d at 781. But there are no such allegations here.

The SAC does not allege any facts plausibly suggesting that particular physicians with whom anesthesia providers have relationships decide who provides anesthesia services to their patients. It certainly does not allege facts indicating that such referrals are the "lifeblood" of American Anesthesiology's business, or otherwise critical to it. In fact, since the SAC alleges that American Anesthesiology had an exclusive contract with Holy Cross for the provision of anesthesia services (ECF No. 36, SAC ¶5), it is apparent from the SAC that the contract, not the

surgeons and other physicians, determined that American Anesthesiology providers would be used.

Remarkably, the SAC never alleges, with specific facts or even in a conclusory fashion, that surgeons and other physicians performing procedures requiring anesthesia refer their patients to particular anesthesia providers. American Anesthesiology's efforts to hint at this conclusion without ever stating facts that would support it (because it cannot) is completely inadequate to state a claim.

American Anesthesiology's only attempt to allege facts that could suggest that relationships between anesthesia providers and surgeons and other physicians drive patient choices is contained in its selective quotations (effectively misquotations) of Holy Cross's complaint. But all the cited paragraphs say in substance is that if the American Anesthesiology providers were suddenly replaced "*en masse*" and Holy Cross's surgeons, cardiologists and ob/gyns "immediately" had to work with "other anesthesia providers with whom they were not familiar and the replacement anesthesia providers were not familiar with the hospital facilities," this could cause shifts in business. (ECF No. 1, Complaint, ¶49.) That is because the (inevitable) use of temporary, "locum tenens" providers are "inherently less satisfactory than relationships with permanently employed anesthesia providers." (*Id.* ¶31.) These statements do not support a claim that surgeons are likely to follow anesthesia providers, and anesthesia patients are likely in turn to follow their surgeons, to other facilities under normal circumstances. Indeed, these statements concern potential losses by Holy Cross, not business being unfairly obtained by Holy Cross.

Moreover, American Anesthesiology cannot rely on its (mis) quotations from the foregoing paragraphs of Holy Cross' Complaint, because American Anesthesiology denies those specific

Complaint allegations in its Second Amended Answer. (*See* ECF No. 36, Second Amended *Answer* (pp. 5-6) ¶¶31, 49.)

Equally critically, even if Holy Cross could avoid losing patients by hiring American Anesthesiology's providers, there are no facts to indicate that that could be somehow viewed as "unfair competition." "The [Florida restrictive covenant] statute protects 'customer' and 'client' relationships because when an employee forms those relationships and takes them to a new company, he has a competitive advantage over his old company in gaining that customer's business." *Blue-Grace Logistics LLC v. Fahey*, 653 F. Supp. 3d 1172, 1181 (M.D. Fla. 2023). *See also White*, *supra* at 785 (covenant must prevent "an unfair advantage in future competition with the employer"). No facts are alleged indicating any prospect of any future competition between American Anesthesiology and Holy Cross. American Anesthesiology does not allege that it has any contracts with other area facilities where these anesthesia providers might switch their practice but for Holy Cross' solicitations. The SAC's allegations certainly do not support a conclusion that unfair competition could occur.

"It is not enough to merely assert the concept of goodwill." *Properties of Villages,* 2020 WL 6270932, at *8 (finding that generic allegations did not establish legitimate interest in customer goodwill). That is effectively all that American Anesthesiology has done here.

**b.    The SAC's Allegations Regarding Training and Recruiting are Inadequate**

**(i)    Training**

Nor has American Anesthesiology alleged facts supporting a legitimate business interest in training. American Anesthesiology's conclusory allegations about training are insufficient.

Training can only constitute a legitimate business interest when the training rises to the level of being "extraordinary or specialized." Fla. Stat. § 542.335(1)(b)(5). *See Proudfoot*

*Consulting Co. v. Gordon*, 576 F.3d 1223, 1233 n.9 (11th Cir. 2009) (finding movant did not establish that training went 'beyond what is usual, regular, common, or customary' in the consulting industry and would only seem to be 'specialized' in the sense that it was geared to its own methodologies, practices and procedures."); *IDMWORKS, LLC v. Pophaly*, 192 F. Supp. 3d 1335, 1342 (S.D. Fla. 2016) (finding that plaintiff failed to adduce evidence that training provided to defendant went beyond industry norms); *Vessels v. Dr. Terrazzo of Fla., LLC*, 352 So.3d 946, 949 (Fla. 5th DCA 2022) ("[O]n-the-job training that [is] 'usual, regular, common or customary in the industry,' . . . does not qualify as extraordinary or specialized training under section 542.335(1)(b)5."); *Resouluna 4840, LLC v. Palceski*, 2019 WL 7482222, at *4 (M.D. Fla. Sept. 5, 2019) ("[B]asic on-the-job training . . . is not protectable.").

The SAC does allege a modicum of information about the nature of the training provided by American Anesthesiology. It states that American Anesthesiology "trains its clinicians on a variety of best practices, including operating room efficiency, inclusion, problem resolution, and culture building". (ECF No. 36, SAC ¶25.) It states that clinicians are provided with "access to, and training on how to use, the group's proprietary clinical outcome database. . ." *Id.* ¶26. The SAC also alleges that the providers "also have access to Anesthesia Risk Alerts," a proprietary system that has received an award. *Id.* ¶27.

But these facts do not establish that any of this training is extraordinary or different from what is common in the industry. The SAC does not say a word as to how this training compares to what other anesthesia groups receive, and does not offer any facts to suggest that this training is beyond industry norms. Therefore, it is insufficient to establish a basis for a restrictive covenant. Of course, American Anesthesiology's use of the "labels and conclusions" "extraordinary and specialized" without factual support is by itself meaningless. (ECF No. 36, SAC ¶24.)

Moreover, it is impossible to conclude from the SAC that Holy Cross will somehow unfairly compete with American Anesthesiology because of this training, for two reasons. First, training is part of what Holy Cross paid for under the parties' contract. The agreement between Holy Cross and American Anesthesiology specifically states that the providers must be qualified. Agreement at ¶ VIII A-C. Training is, of course, required to assure that that obligation is met. Therefore, training is a service that Holy Cross has paid by virtue of its payments under the Agreement. Any benefits Holy Cross receives from the training are certainly not "unfair."

Indeed, the SAC says that Holy Cross "*has received* invaluable benefits from the Group's investment in the clinicians' training . . ." (ECF No. 36, SAC ¶29 (emphasis added)). The fact that the SAC admits that Holy Cross has already received these benefits prior to any solicitation or employment means that American Anesthesiology does not have a legitimate business interest to protect through its non-solicitation clause. A legitimate business interest in the non-solicitation clause would require Holy Cross' improper receipt of these benefits *only after* and *because of* solicitation and employment of the anesthesia providers, resulting in unfair competition. There is nothing in the SAC alleging facts relating to such a claim.

Second, again, Holy Cross cannot gain a competitive advantage unless American Anesthesiology will be a competitor after the expiration of the Agreement. No such facts are alleged.

(ii)   **Recruiting**

American Anesthesiology also alleges that it has a legitimate business interest in protecting its "investment in… recruiting and retaining a unique set of physicians." (ECF No. 36, SAC ¶48.) These allegations also fail to allege a legitimate business interest for several reasons.

First, "recruiting and retaining" is not a recognized basis for a legitimate business interest under the statute. While that is not necessarily dispositive, as the Supreme Court made clear in

*White, supra*, there must be "special facts" to justify reliance on some other business interest not identified in the statute. No such "special facts" are alleged here. Of course, any service provided by a company's employees requires investment in recruitment and retention of these employees. If that were sufficient to justify a noncompete, then there would be no need for any specific requirements in the statute.

Second, American Anesthesiology does not allege any facts to support this claim. It does not allege facts to indicate that its physicians are "unique." Nor does it provide any detail regarding the magnitude of its investment. Finally, it does not explain how the retention of these physicians would allow Holy Cross to somehow unfairly compete with American Anesthesiology.

Third, the terms of the Agreement are inconsistent with any argument that Holy Cross would somehow be unfairly competing if it were able to enjoy the benefits of the recruitment of these providers. That is because Holy Cross paid for the services of these providers, which required their recruitment by American Anesthesiology. For example, the Agreement says at ¶ II D that American Anesthesiology must provide a sufficient number of providers as necessary at Holy Cross. Obviously, that requires recruitment of those providers. As with training, it is not unreasonable for Holy Cross to benefit from that which it paid for.

> ### 2.   American Anesthesiology Failed to Allege That a Non-Solicitation Clause Is Reasonably Necessary to Protect a Legitimate Business Interest

For many of the same reasons discussed above, American Anesthesiology also fails to explain why the Non-Solicitation Clause "is reasonably necessary to protect [any alleged] legitimate business interest or interests justifying the restriction." Fla. Stat. § 542.335(1)(c).

The SAC says nothing about why a nonsolicitation clause is reasonably necessary to protect the alleged relationships between American Anesthesiology's anesthesia providers and surgeons and other physicians performing procedures utilizing anesthesia at Holy Cross. Will American

Anesthesiology lose these relationships and therefore anesthesia patients? Where would it otherwise treat these patients? The SAC does not say.

Nor has American Anesthesiology pleaded any facts to indicate that a nonsolicitation clause is somehow reasonably necessary to protect the value of its training or recruitment efforts. That would be true only if the training provided by American Anesthesiology was both unusual and could be used by Holy Cross to American Anesthesiology's detriment. But American Anesthesiology, again, has not alleged that it serves any other facilities in the area, and therefore that Holy Cross' employment of its anesthesia providers would somehow constitute unfair competition. The SAC contains no allegations even suggesting that Holy Cross and American Anesthesiology would be competitors after the Agreement expires. Since "preventing unfair competition" is the *sine qua non* of any valid restrictive covenant, *White,* supra, this omission is fatal to American Anesthesiology's claim.

Nor do the Counterclaims allege that the anesthesia providers could somehow benefit in the future in any way from their past access to the American Anesthesiology database or its Anesthesia Risk Alerts. American Anesthesiology does not allege that this information is portable, or that it would be accessible to any of the anesthesia providers after they become employed by Holy Cross. If it would not be, then there would be no opportunity for Holy Cross to unfairly benefit from this information in the future to American Anesthesiology's detriment. For this reason as well, a prohibition on nonsolicitation is not reasonably necessary to protect American Anesthesiology's *alleged* business interest.

### 3.   These Failures are Fatal to the Breach of Contract Claim

Because the Non-Solicitation Clause is not enforceable, the breach of contract claim fails as a matter of law and should be dismissed. For example, in *Ebbeskov Jankovic, LLC v. Johansen*, Case No. 21-cv-62410, 2022 WL 3681930, at *2 (S.D. Fla. May 6, 2022), the court dismissed a

plaintiff's breach of contract claim for these reasons. *See also U.S. Alliance Management Corp. v. Airbus Americas Customer Servs., Inc.*, Case No. 19-cv-24066, 2020 WL 13613823, at *5 (S.D. Fla. Jan. 30, 2020) (granting motion to dismiss amended complaint in which plaintiff failed to plead the existence of legitimate business interest justifying the restrictive covenant). American Anesthesiology's breach of contract claim should similarly be dismissed.

### C.      American Anesthesiology's Tortious Interference Claim Should Be Dismissed

American Anesthesiology also cannot satisfy several of the requisite elements of its claim that Holy Cross tortiously interfered with a business relationship. "Under Florida law, the elements of tortious interference with a business relationship are: (1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff." *Int'l Sales & Serv., Inc. v. Austral Insulated Prods. Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001) (citing *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994)).

### 1.      The SAC Does Not Allege Interference with Any Legal Rights

First, American Anesthesiology fails to adequately allege that it has specific business relationships that afford it "existing or prospective legal rights." *Int'l Sales & Serv., supra*. A claim for intentional interference with a business relationship is deficient if it fails to include such allegations. *See, e.g.*, *Plain Bay Sales, LLC v. Gallaher*, Case No. 18-CV-80581, 2019 WL 6206836, at *3 (S.D. Fla. Nov. 21, 2019); *Register v. Pierce*, 530 So.2d 990, 993 (Fla. 1st DCA 1988); *Lake Gateway Motor Inn, Inc. v. Matt's Sunshine Gift Shops, Inc.*, 361 So. 2d 769, 772 (Fla. 4th DCA 1978).

Here, American Anesthesiology appears to be asserting that its legal rights stem from non-compete provisions contained in contracts with its anesthesia providers. The SAC, however, does

not contain any specific allegations regarding the non-compete provisions. The Counterclaims merely allege, in conclusory fashion, that the providers "signed employment agreements that contain *a variety of provisions*, including ones addressing the ability to compete following termination of employment." (ECF No. 36, SAC ¶46 (emphasis added).) The SAC does not identify the parties to the contracts, the terms of the contracts or the specific terms of the non-compete clauses that it alleges that the providers threaten to breach.

American Anesthesiology alleges that the non-compete provisions are valid because they aim to protect the exact same "goodwill" and "investment" that American Anesthesiology claims are protected by the Non-Solicitation Clause. (*See* ECF No. 36, SAC ¶48.) For the same reasons that these claims fail, American Anesthesiology's claims regarding the noncompete provisions are inadequate.

Moreover, even if non-compete clauses were supported by a legitimate business interest, they would not be enforceable unless they involved reasonable time periods and geographic areas. *See* Fla. Stat. § 542.335(1)(b),(c). No facts are alleged to indicate that the noncompetes satisfy these requirements.

### 2.      There Are No Allegations of Unjustified Interference

Second, American Anesthesiology has not adequately alleged that Holy Cross engaged in unjustified interference. A determination as to whether a party acted without justification "requires 'an examination of the defendant's conduct, its motive, and the interests it sought to advance.'" *Duty Free Americas, Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1279 (11th Cir. 2015) (quoting *Sec. Title Guarantee Corp. of Balt. v. McDill Columbus Corp.,* 543 So. 2d 852, 855 (Fla. 2d DCA 1989)).

Florida law makes clear that conduct is justified as a matter of law if the defendant is protecting "its own established economic interest":

> "If a defendant interferes with a contract in order to safeguard a preexisting economic interest of his own, the defendant's right to protect his own established economic interest outweighs the plaintiff's right to be free of interference, and his actions are usually recognized as privileged and nonactionable." *See Heavener, Ogier Servs., Inc. v. R.W. Fla. Region, Inc.*, 418 So.2d 1074, 1076-77 (Fla.Dist.Ct.App.1982); *Sec. Title Guarantee Corp. of Balt.*, 543 So.2d at 855 (noting that, as "long as improper means are not employed, activities taken to safeguard or promote [a company's] own financial interests are entirely non-actionable." (quotation and alteration omitted)).

*Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1280 (2015).

The SAC itself makes clear that Holy Cross has acted to protect its own economic interest in avoiding the disruption of surgery and other procedures requiring anesthesia at its hospitals:

> Holy Cross also acknowledges that "[i]f [its] physicians were forced to immediately work with other anesthesia providers with whom they were not familiar and the replacement anesthesia providers were not familiar with the hospital facilities, this would cause a significant disruption at Holy Cross, and would also make it more likely that many of these surgeons, cardiologists, OB/GYNs and other proceduralists would shift some or all of their cases to other hospitals." *Id.*

> *                *                *

> As Holy Cross acknowledges, having "a stable relationship with a core group of local anesthesia providers who know the surgeons, other proceduralists and nursing teams working at the hospital highly enhances the care of patients." Complaint ¶ 26.

(*See* ECF No. 36, SAC ¶¶21, 22.)

Therefore, Holy Cross's efforts to keep its anesthesia providers "are entirely non-actionable," unless American Anesthesiology alleges "a purely malicious motive," or "improper motives" were utilized. *Id. See also, Ingenuity, Inc. v. Linshell Innovations Ltd.*, Case No. 6:11-cv-93, 2014 WL 1230695, at *4 (M.D. Fla. Mar. 25, 2014) ("the existence of malice is key to the tort of tortious interference with a business relationship"), *aff'd*, 644 F. App'x 913 (11th Cir. 2016); *Bryan Media, Inc. v. City of St. Petersburg*, Case No. 8:05-CV-291-T-MSS, 2006 WL 8440094,

at *10 (M.D. Fla. Dec. 11, 2006) ("The plaintiff must prove that the defendant's interference was maliciously motivated."), *aff'd,* 293 F. App'x 717 (11th Cir. 2008).

American Anesthesiology's allegations do not come close to alleging facts that any interference by Holy Cross was maliciously motivated. The only motive identified in the SAC is Holy Cross' desire to maintain high quality surgeries and other procedures after its contract with American Anesthesiology expires. Of course, that motive is entirely lawful.

Nor has American Anesthesiology alleged facts indicating that Holy Cross has engaged in improper methods of interference. American Anesthesiology's allegation that Holy Cross made unspecified "dubious representations" in order to induce the clinicians to leave American Anesthesiology's employment does not come close to supporting a claim of improper action. (ECF No. 36, SAC ¶51.) To adequately state such a claim of disparagement, American Anesthesiology must allege: (1) a falsehood; (2) has been published, or communicated to a third person; (3) when the defendant-publisher knows or reasonably should know that it will likely result in inducing others not to deal with the plaintiff; (4) the falsehood plays a material and substantial part in inducing others not to deal with the plaintiff; and (5) special damages are proximately caused as a result of the published falsehood. *See ADT LLC v. Vivant Smart Home, Inc.*, Case No. 20-23391-CIV, 2021 WL 4478932, at *2 (S.D. Fla. Sept. 30, 2021). American Anesthesiology does not allege any of these elements, including any falsehood, how any disparagement induced others not to deal with it, or any special damages caused as a result of a published falsehood.

### 3.   The SAC Makes Clear that Holy Cross Is Not a "Stranger to the Relationship"

Third, "[f]or interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship." *Palm Beach Cnty. Health Care Dist. v. Pro. Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009) (citing *Salit v. Ruden, McClosky, Smith, Schuster*

& *Russell, P.A.*, 742 So. 2d 381, 385 (Fla. 4th DCA 1999)). "A defendant is not a 'stranger' to a business relationship if the defendant 'has any beneficial or economic interest in, or control over, that relationship.' " *Id.* at 1094 (citing *Nimbus Tech., Inc. v. SunnData Prods., Inc.*, 484 F.3d 1305, 1309 (11th Cir. 2007)).

Here, American Anesthesiology's own allegations demonstrate that Holy Cross is not a "stranger" to American Anesthesiology's business relationship with the clinicians but an interested party. Indeed, American Anesthesiology alleges that the clinicians perform anesthesia services at Holy Cross pursuant to the Agreement between American Anesthesiology and Holy Cross. (ECF No. 36, SAC ¶¶5,45.) Holy Cross clearly has an economic interest in the relationship with the clinicians who perform anesthesiology services at its hospital.

Many decisions have dismissed tortious interference claims for these reasons. *See, e.g.*, *Hvide v. Holt Fin. Ltd.*, Case No. 20-22266-CIV, 2021 WL 8154846, at *14 (S.D. Fla. Sept. 13, 2021) (dismissing tortious interfere with business relationship claim where parties were acting as agents of the contracting parties and had a supervisory interest); *Concierge Servs., Inc. v. Flagler Holdings VI Beta Inc.*, Case No. 21-20746-CIV, 2021 WL 3934225, at *4 (S.D. Fla. May 27, 2021) (dismissing tortious interference with business relationship claim where defendant had "a financial interest" in plaintiff's contract with airlines); *Big Ligas, LLC v. Yu*, Case No. 20-23719-CIV, 2021 WL 1518993, at *4 (S.D. Fla. Apr. 16, 2021) (dismissing tortious interference with business relationship claim because economic interests were intertwined with plaintiff and actions were simply "freedom of contract"); *Columna, Inc. v. Aetna Health, Inc.*, Case No. 19-80522-CIV, 2019 WL 4345675, at *6 (S.D. Fla. Sept. 12, 2019) (dismissing tortious interference claim because defendant was not a stranger to the business relationship).

17

### 4.   There Are No Allegations of Specific Intent

Fourth, actionable tortious interference requires a "specific intent" to interfere, which requires more than that the accused party acted with knowledge that the conduct it seeks would breach another contract. *See Ingenuity, supra* at *4; *Bryan Media*, *supra* at *11. "'[o]ne does not induce another to commit a breach of contract with a third person … when he merely enters into an agreement with the other with knowledge that the other cannot perform both it and his contract with the third person.'" *See Ingenuity, supra* at *4. No facts are alleged here indicating anything more than that Holy Cross sought to employ the anesthesia providers with knowledge that they would be breaching contracts with American Anesthesiology. There are no factual (or even conclusory) allegations indicating that Holy Cross specifically desired to disrupt American Anesthesiology's relationships. That is insufficient under Florida law.

## IV.   CONCLUSION

For the reasons explained above, the SAC should be dismissed in its entirety for failure to state a claim. American Anesthesiology should be denied leave to amend again, for two reasons. First, as described above, many of the statute's requirements cannot be met given the SAC's own allegations. Therefore, any amendment would be futile. *See Vanderberg v. Donaldson*, 259 F.3d 1321, 1326-27 (11th Cir. 2001) (affirming "the district court's permissible choice" to deny a motion for leave to amend where "the amendment was futile").

Second, American Anesthesiology has now had at least two opportunities to get this right. That is more than sufficient. The time and resources of the parties and the Court should not be consumed by yet another inadequate effort to state a claim. The SAC should be dismissed with prejudice.

Dated: May 13, 2024                           s/*Peter R. Goldman*
                                                  Peter R. Goldman (FL Bar No. 86056)
                                                  Danna Khawam (FL Bar No. 1025114)

Nelson Mullins Riley & Scarborough LLP
100 S.E. 3rd Ave., Suite 2700
Fort Lauderdale, FL 33394
(954) 745-5239 (p)
(954) 761-8135 (f)
peter.goldman@nelsonmullins.com
danna.khawam@nelsonmullins.com


s/*David A. Ettinger* (with permission)

David A. Ettinger (P26537) (admitted pro hac)
Benjamin VanderWerp (P84614) (admitted pro hac)
Honigman LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
(313) 465-7368 (p)
(313) 465-7369 (f)
dettinger@honigman.com
bvanderwerp@honigman.com

*Attorneys for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 13, 2024, the foregoing was electronically filed with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to all counsel of

record.

/s/ Peter R. Goldman
Peter R. Goldman