IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

|  |  |  |
|---|---|---|
| HOLY CROSS HOSPITAL, INC., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | Civil Action No.: 0:24-cv-60315-DSL |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN ANESTHESIOLOGY | ) | |
| SERVICES OF FLORIDA, INC., | ) | |
| AMERICAN ANESTHESIOLOGY, INC., | ) | |
| NMSC II, LLC and NORTH AMERICAN | ) | |
| PARTNERS IN ANESTHESIA, L.L.P., | ) | |
| | ) | |
| Defendants/Counterclaim- | ) | |
| Plaintiffs. | ) | |
| | ) | |
| AMERICAN ANESTHESIOLOGY | ) | |
| SERVICES OF FLORIDA, INC., | ) | |
| | ) | |
| Counterclaim-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HOLY CROSS HOSPITAL, INC., | ) | |
| | ) | |
| Counterclaim-Defendant. | ) | |
| | ) | |

**HOLY CROSS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS ANTITRUST CLAIMS FOR MONETARY DAMAGES**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

MEMORANDUM OF LAW ...............................................................................................1

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF ALLEGED FACTS....................................................................1

III.    APPLICABLE STANDARD....................................................................................4

IV.     HOLY CROSS HAS SATISFIED THE JURISDICTIONAL STANDARDS OF
        ARTICLE III............................................................................................................4

        A.      Holy Cross' Injuries Are Caused By Defendants' Enforcement of the
                Noncompetes and Nonsolicitation Clause ...............................................5

        B.      Defendants' Theory is Antithetical to Basic Principles of the Antitrust
                Laws..........................................................................................................7

        C.      Holy Cross' Execution of the Agreement Does Not Bar Its Claim .........9

        D.      Defendants' Other Arguments Are No More Persuasive .......................11

        E.      A Favorable Decision Will Redress Holy Cross' Injuries .....................13

V.      REQUEST FOR HEARING...................................................................................14

VI.     CONCLUSION......................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ass'n of Am. Physicians & Surgeons v. F.D.A*,
 13 F.4th 531 (6th Cir. 2021) ..................................................................................4

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
 2018 WL 3032552 (S.D. Cal. June 19, 2018)........................................................13

*Banco Industrial De Venezuela, C.A. v. Credit Suisse*,
 99 F.3d 1045 (11th Cir.1996) ................................................................................10

*Bennett v. Spear*,
 520 U.S. 154 (1997)..................................................................................................4

*Blue Shield of Virginia v. McCready*,
 457 U.S. 465 (1982)..................................................................................................8

*In re Brand Name Prescription Drugs Antitrust Litig.*,
 123 F.3d 599 (7th Cir. 1997), *abrogated on other grounds by Rivet v. Regions
 Bank of La.*, 522 U.S. 470 (1998) .........................................................................11

*Collins v. Yellen*,
 594 U.S. 220 (2021)..................................................................................................9

*Focus on the Fam. v. Pinellas Suncoast Transit Auth.*,
 344 F.3d 1263 (11th Cir. 2003) .........................................................................5, 14

*Gulf States Reorganization Group, Inc. v. Nucor Corp.*,
 466 F.3d 961 (11th Cir. 2006) .............................................................................5, 6

*Houston v. Marod Supermarkets, Inc.*,
 733 F.3d 1323 (11th Cir. 2013) ...........................................................................4, 5

*Isaksen v. Vt. Castings, Inc.*,
 825 F.2d 1158 (7th Cir. 1987) ...............................................................................11

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*,
 340 U.S. 211 (1951)................................................................................................10

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
 762 F.3d 1114 (10th Cir. 2014) .............................................................................13

*Lugan v. Defenders of Wildlife*,
 504 U.S. 555 (1992).........................................................................................1, 4, 5

ii

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*,
  62 F.3d 967 (7th Cir.1995) ................................................................................11

*Memorex Corp. v. Int'l Bus. Machines Corp.*,
  555 F.2d 1379 (9th Cir. 1977) ...........................................................................10

*Moecker v. Honeywell Intern., Inc.*,
  144 F.Supp.2d 1291 (C.D. Fla. 2001)............................................................10, 12

*Northern Pacific Ry. Co. v. United States*,
  356 U.S. 1 (1958)..................................................................................................8

*Outlet Communications, Inc. v. King World Production, Inc.*,
  685 F. Supp. 1570 (M.D. Fla. 1988)....................................................................13

*Patt v. Antech Diagnostics, Inc.*,
  2020 WL 5076970 (C.D. Cal. May 18, 2020). ECF No. 56 ..................................9

*Perma Life Mufflers, Inc. v. International Parts Corp.*,
  392 U.S. 134 (1968)............................................................................................10

*Resnick v. AvMed, Inc.*,
  693 F.3d 1317 (11th Cir. 2012) ..........................................................................14

*Spectators' Communication Network, Inc. v. Colonial Country Club*,
  253 F.3d 215 (5th Cir. 2001) ..............................................................................11

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)............................................................................................13

*Sports Racing Services, Inc. v. Sports Car Club of Am., Inc.*,
  131 F.3d 874 (10th Cir. 1997) ............................................................................10

*Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia*,
  815 F.2d 1407 (11th Cir. 1987) ......................................................................8, 13

*Tidmore Oil Co., Inc. v. BP Oil Co.*,
  932 F.2d 1384 (11th Cir.1991) ...........................................................................10

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005)................................................................................13

*United States v. Paramount Pictures, Inc.*,
  334 U.S. 131 (1948)............................................................................................11

*Walters v. Fast AC, LLC*,
  60 F.4th 642 (11th Cir. 2023) ..........................................................................6, 7

iii

*Worthy v. City of Phenix City*,
930 F.3d 1206 (11th Cir. 2019) ............................................................................................4

**OTHER AUTHORITIES**

Areeda & Hovenkamp, *Antitrust Law* ..............................................................................12

Housing and Economic Recovery Act of 2008................................................................9

Section 1 of the Sherman Act ..............................................................................7, 9, 11

56772334.14

<u>**MEMORANDUM OF LAW**</u>

**I.      <u>INTRODUCTION</u>**

American Anesthesiology Services of Florida, Inc., American Anesthesiology, Inc., NMSC II, LLC and North American Partners in Anesthesia, L.L.P.'s ("Defendants") Motion to Dismiss Holy Cross Hospital, Inc.'s Antitrust Claims for Monetary Damages and Incorporated Memorandum of Law (ECF No. 56) ("Motion to Dismiss") completely ignores the critical allegations in Holy Cross' First Amended Complaint (ECF No. 52) ("FAC"). These allegations make clear that the damages claimed by Holy Cross are "fairly traceable" to the challenged conduct, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992), i.e. Defendants' insistence on the enforcement of the nonsolicitation clause in its agreement with Holy Cross and the noncompete clauses in its agreements with its anesthesia providers. The FAC could not be more clear: Holy Cross would not have entered into multiple extensions of the agreement imposing burdensome terms on Holy Cross in the absence of the anticompetitive nonsolicitation clause and the noncompetes. Under the circumstances, causation is apparent, and standing is properly alleged.

**II.     <u>STATEMENT OF ALLEGED FACTS</u>**

Holy Cross' First Amended Complaint (ECF No. 52) contains the following alleged facts:

Holy Cross entered into an Agreement for the provision of anesthesia services with American Anesthesiology Services of Florida, Inc. ("American Anesthesiology") in 2021. FAC ¶29. The Agreement's term has been extended several times. *Id.*

The Agreement imposed unreasonable payment requirements on Holy Cross in numerous respects. These included the requirement that Holy Cross subsidize the excess of American Anesthesiology's expenses over the revenues it collected, but did not impose any requirements on American Anesthesiology to make reasonable efforts to collect the sums owed it, minimize denial of its claims, or take other steps to maximize its revenues. *Id.* ¶30. The unreasonable payments

1

also included excessive use of costly temporary, "locum tenens," physicians. *Id.* ¶¶30(c), 31. These subsidies grew substantially over time, from no subsidy in 2021, to a subsidy in 2024 at an annualized rate of almost $4 million. *Id.* ¶32.

American Anesthesiology has also been unable or unwilling to adequately staff procedures at Holy Cross. *Id.* ¶35. This has seriously interfered with hospital operations and caused Holy Cross to delay cases and incur unnecessary expenses for cases which could not be performed at the scheduled times. *Id.* ¶36. The Agreement did not provide for the payment by American Anesthesiology of any remedies for such inadequate staffing. *Id.* ¶40.

Nevertheless, as noted above, Holy Cross was forced to agree to extensions of the Agreement on several occasions. The Agreement was extended, without modifying any of the unreasonable provisions discussed above, on April 24, 2023, July 28, 2023, August 31, 2023, and December 14, 2023. *See* Exhibit 1 to ECF No. 58.

Holy Cross was forced to agree to these extensions because "[t]he characteristics of the market for anesthesia services in Broward County and the contracts entered into by Defendants and Holy Cross give Defendants the power to effectively shut off anesthesia services at Holy Cross if Holy Cross will not pay Defendants what they demand." *Id.* ¶44. This power arises from the "post-term noncompetition clauses" in contracts between the anesthesia providers and Defendants, *id.*, as well as "the nonsolicitation clause in the contract between Holy Cross and American Anesthesiology." *Id.* ¶46.

Holy Cross was unable to walk away from the Agreement because, absent its ability to hire American Anesthesiology's anesthesia providers, "[t]here is no possibility that Holy Cross could obtain anesthesia services from other sources at the volumes needed to completely replace the services rendered by American Anesthesiology and therefore to operate the hospital. Any effort to

replace the anesthesia providers at Holy Cross en masse would create impossible problems in covering the care of patients for the hospital." *Id.* ¶50. This is because of the significant shortage of anesthesia providers and the fact that anesthesia providers working at other groups in Broward County are also subject to noncompete clauses. *Id.* ¶¶47-48. "For all these reasons, if Holy Cross sought to end its arrangement with Defendants without the opportunity to seek to employ Defendants' anesthesia providers, it would be faced with a critical shortfall in anesthesia care." *Id.* ¶51.

As further explained in the FAC, "[b]ecause Holy Cross has no adequate substitutes for its existing anesthesia providers, Defendants are able to demand higher than competitive rates and contract terms, because they know that the noncompetes and nonsolicitation clause preclude Holy Cross from accessing any realistic alternative to Defendants' anesthesia providers." *Id.* ¶54.

Because $75 million annually at Holy Cross is at stake if anesthesia care is not available, Holy Cross could not risk the loss of anesthesia care, and was forced to make the unreasonable payments required under the Agreement and to agree to extensions of the Agreement. *Id.* ¶55. In summary: "Defendants' insistence on enforcement of their noncompetes and nonsolicitation clause forced Holy Cross until 2024 to accept the unreasonable terms demanded by Defendants, to pay exorbitant amounts for anesthesia services, and to accept the staffing inadequacies and shortfalls engaged in by Defendants. This damaged Holy Cross in the millions of dollars." *Id.* ¶56. As the FAC also states:

> Because of their enforcement of the noncompetes and nonsolicitation clause, Defendants have been able to harm Holy Cross, by demanding and receiving exorbitant and uncompetitive terms for the services they provide, and by refusing to adequately staff Holy Cross without fear (until now) that the contract would not be renewed, as outlined above.

*Id.* ¶116

III.   **APPLICABLE STANDARD**

"Facial attacks to subject matter jurisdiction require the court merely to look and see if the plaintiff's complaint has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion. *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335-36 (11th Cir. 2013) (citing *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir.2009)). And "at this stage, when there are two equally plausible ways to read a complaint, [courts] should adopt the reading that is most favorable to [the plaintiff]." *Worthy v. City of Phenix City*, 930 F.3d 1206, 1214 (11th Cir. 2019) (quotation marks omitted).

In connection with an Article III motion on jurisdiction, "[e]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citing *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 883–889 (1990)). The plaintiff's burden at the pleading stage is "relatively modest." *Bennett v. Spear*, 520 U.S. 154, 170–71 (1997); *see also Worthy*, 930 F.3d at 1214 ("[A]t the motion-to-dismiss stage . . . it may be sufficient to provide general factual allegations of injury resulting from the defendant's conduct." (citations and quotations omitted)). Therefore, the question at the pleading stage is whether, "[a]ccepting as true the complaint's factual allegations," the plaintiff has asserted a "plausible claim" to support jurisdiction. *Ass'n of Am. Physicians & Surgeons v. F.D.A*, 13 F.4th 531, 544 (6th Cir. 2021).

IV.   **HOLY CROSS HAS SATISFIED THE JURISDICTIONAL STANDARDS OF ARTICLE III**

Plaintiffs must satisfy three requirements to have standing under Article III: (1) "injury-in-fact"; (2) "a causal connection between the asserted injury-in-fact and the challenged action of the

defendant"; and (3) "that the injury will be redressed by a favorable decision." *Houston*, 733 F.3d at 1328 (quoting *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir.2001)); *see also Lujan*, 504 U.S. at 560-61.

American Anesthesiology does not dispute that Holy Cross has alleged an injury-in-fact. It argues that Holy Cross' injury was not caused by Defendants' enforcement of the noncompetes and nonsolicitation clause, and that a favorable decision by this Court would not redress Holy Cross' injury. Both claims are refuted by the allegations of the FAC, set forth above, which describe the causal connection between Defendants' antitrust violations and the injury to Holy Cross.

### A.     Holy Cross' Injuries Are Caused By Defendants' Enforcement of the Noncompetes and Nonsolicitation Clause

To establish standing, a plaintiff must allege "a causal connection between the injury and the conduct complained of[.]" *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 466 F.3d 961, 965 (11th Cir. 2006) (quoting *Lujan*, 504 U.S. at 560). However, "[a]ntitrust law does not require that the defendant be the exclusive cause of the plaintiff's injury but only a 'material' one." *Id.* (citing *Cable Holdings of Georgia, Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1561-62 (11th Cir.1987)). *See also Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) ("[N]o authority even remotely suggests that proximate causation applies to the doctrine of standing." (citations and quotations omitted)).

As described above, the FAC explains that Holy Cross was forced to accept numerous extensions to its agreement with Defendants, despite the increasing payment levels involved and inadequate staffing, because the nonsolicitation clause and noncompete clauses gave it no alternative. It is therefore clearly *not* the case that Holy Cross would have suffered the same injury whether or not there were antitrust violations here. Absent the antitrust violations, Holy Cross

5

would have exited the Agreement and no longer dealt with American Anesthesiology. That is more than sufficient to satisfy the causation requirements of Article III.

*Gulf States* directly applies here. In that case, the dispute centered on the acquisition of assets in a bankruptcy auction. Nucor ultimately won the auction, having placed the highest bid of $6.3 million. Gulf States sued, alleging that Nucor's purchase, as a monopolist in the relevant market, violated the Sherman Act. Nucor argued that the failure of Gulf States to acquire the bankruptcy assets was not traceable to Nucor's involvement, but was instead due to Gulf States' failure to make a higher bid. The district court agreed and dismissed the claims on standing grounds. The Eleventh Circuit reversed, holding that although it is true that Gulf States could have prevailed by submitting a higher bid, its "need to make a higher bid was occasioned only by the participation of Nucor. If Nucor's participation were a violation of the antitrust laws—an issue that we do not decide today—then it would be improper to regard the Group's injury as entirely self-caused."

*Gulf States* demonstrates that even if an injury may be traceable to, in part, other causes, Article III standing is still established if the injury also resulted from anticompetitive conduct. That is precisely what is alleged here.

American Anesthesiology's "traceability" cases are not to the contrary. To be sure, *Walters* stands for the uncontroversial proposition that injury is not fairly traceable to the defendant's misconduct "if an independent source would have caused him to suffer the same injury." *Walters v. Fast AC, LLC*, 60 F.4th 642, 650-51 (11th Cir. 2023) (emphasis added). But the allegations here are that the injury would not have occurred without the noncompete or nonsolicitation clauses, because Holy Cross would not have decided on multiple occasions to extend the Agreement in the absence of those clauses. Therefore, there is no "independent" source of injury. The acceptance of

the Agreement's provisions and American Anesthesiology's implementation of them was wholly dependent on its anticompetitive use of the noncompetes and nonsolicitation clause.

Moreover, as *Walters* itself explains, "[e]ven harms that flow indirectly from the action in question can be 'fairly traceable' to that action for standing purposes." *Walters*, 60 F.4th at 650 (emphasis added) (alterations omitted) (quoting *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003)). In other words, American Anesthesiology's enforcement of the noncompetes and nonsolicitation clause, and its resulting market power, are the "*de facto*" cause of Holy Cross' injury. *Id.* (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)). Had American Anesthesiology not benefited from the anticompetitive nonsolicitation clause and noncompetes, Holy Cross would not have been forced to accept burdensome and costly payment obligations and staffing shortfalls in the first place. Nor would it have faced the dilemma of either continuing to accept American Anesthesiology's unreasonable terms or else face a critical shortfall in anesthesia care.

Indeed, Defendants' own statement of the standard here establishes why they cannot prevail. They say in ECF No. 56 at p.7 that "traceability [is] lacking if the plaintiff would have been injured in *precisely the same way* without defendants' alleged misconduct." (Citing *Walters* (emphasis added).) Quite clearly, the FAC says that Holy Cross would not have been injured in precisely the same way (or at all) but for the noncompetes and nonsolicitation clause, because it would not have agreed to extend the contract.

**B.**     **Defendants' Theory is Antithetical to Basic Principles of the Antitrust Laws**

The idea that the presence of an agreement somehow negates the critical causal relationship between an antitrust violation and harm is antithetical to some of the most basic principles of antitrust jurisprudence. Indeed, Section 1 of the Sherman Act, invoked in this case, says that every "contract . . . in restraint of trade . . . is . . . illegal." "Tying" agreements are one good example,

7

since they involve a party's coerced agreement to buy a second product or service in order to obtain a needed first product or service. *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958); *see also Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia*, 815 F.2d 1407, 1418 (11th Cir. 1987) (holding that tying agreement violated antitrust laws, where "the facts and circumstances surrounding the transaction as a practical matter forced the buyer into purchasing the tied product.").

The "parade of horribles" that would arise from acceptance of Defendants' analysis is almost endless. For example, under Defendants' approach, every claim by a purchaser that it overpaid for a product because the product was the subject of price fixing would fail to satisfy Article III standing as long as the products were purchased under an agreement with the seller. The price fixers would be able to argue, as Defendants have here, that the injury was due to the high price in the agreement, and that cut the causal link. Of course, no price fixer would possibly venture such an argument, because it completely negates the ability to sue for antitrust violations as long as, somewhere in the chain, there is an agreement. That argument would make no sense. Nor does Defendants' argument here.

Were Defendants' interpretation adopted, no private actions under the antitrust laws would be possible whenever the actions that injured a private party could have, in theory, occurred some other way. Since this is virtually always true, such an approach would eviscerate the intent of Congress to allow "private attorneys general" to enforce the antitrust laws for the benefit of the public. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472 (1982) ("Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions.").

Moreover, Defendants cannot argue that the Agreement is completely divorced from the antitrust allegations here. Of course, the Agreement itself contains the nonsolicitation clause which Holy Cross claims to be an antitrust violation. Just as a tying agreement can be unlawful because it coerces purchases of unwanted tied products, the Agreement here is alleged to be unlawful because the nonsolicitation clause has coerced Holy Cross into accepting unreasonable and burdensome terms because it had no realistic alternative.

*Collins v. Yellen*, 594 U.S. 220, 227 (2021), cited by Defendants, also supports Holy Cross' claim of standing. There, shareholders in Fannie Mae and Freddie Mac sued the Secretary of the Treasury on the ground that a certain amendment to an agreement entered into by the Federal Housing Finance Agency (FHFA), acting as conservator under the Housing and Economic Recovery Act of 2008 (the "Recovery Act"), was unconstitutional because the structure of the FHFA violated separation of powers principles. The lower court found that the shareholders lacked standing because they "could not trace their injury to the Recovery Act's removal restriction." *Id.* at 243. The Supreme Court reversed, holding that "for purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of law that is challenged." *Id.* Because the alleged unlawful conduct was the FHFA's actions in entering into the amendment, "and because the shareholders' concrete injury flows directly from that amendment, the traceability requirement [was] satisfied." The same is true here.

### C.    Holy Cross' Execution of the Agreement Does Not Bar Its Claim

Defendants also argue that "Holy Cross is a party to the Agreement and Amendments containing these provisions, and a party cannot predicate a claim under Section 1 of the Sherman Act on a contract to which it is a party," citing an out of circuit district court decision, *Patt v. Antech Diagnostics, Inc.*, 2020 WL 5076970, at *4 (C.D. Cal. May 18, 2020). ECF No. 56 at p.8.

This is flatly wrong. As the Supreme Court explained in *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134 (1968), "the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition." *Id.* at 139 (rejecting defense of *in pari delicto*).[1] For these reasons, the plaintiff in *Perma Life* was permitted to challenge an agreement to which it was a party. *See also Sports Racing Services, Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 887 (10th Cir. 1997) (party to tying agreement permitted to challenge agreement as an antitrust violation).

The Eleventh Circuit in *Tidmore Oil Co., Inc. v. BP Oil Co.*, 932 F.2d 1384, 1388 (11th Cir.1991), citing *Perma Life,* noted that "the Supreme Court has rejected the application of the doctrine of *in pari delicto* in antitrust actions" and therefore observed in dicta that "an agreement may be challenged even by one of the parties who has acquiesced in the unlawful agreement."

Another Eleventh Circuit decision has applied a more nuanced approach, but one that is equally contrary to Defendants' argument. "[U]nless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater, the *in pari delicto* defense should not be allowed, and the plaintiff should be compensated." *Banco Industrial De Venezuela, C.A. v. Credit Suisse,* 99 F.3d 1045, 1049 (11th Cir.1996). *See also Moecker v. Honeywell Intern.,*

---

[1] "*In pari delicto*" is a defense under which a plaintiff who participated in the wrongdoing cannot recover when he suffers injury as a result of that wrongdoing. *Memorex Corp. v. Int'l Bus. Machines Corp.*, 555 F.2d 1379, 1381 (9th Cir. 1977). *See also Kiefer-Stewart Co. v. Joseph E. Seagram & Sons,* 340 U.S. 211 (1951). In *Kiefer-Stewart*, the Supreme Court held that the participation of a plaintiff wholesaler in a horizontal price-fixing conspiracy was no defense to its lawsuit charging a conspiracy of distillers to sell liquor to wholesalers only if resales were made at fixed prices. 340 U.S. at 214.

*Inc.*, 144 F.Supp.2d 1291, 1314 (C.D. Fla. 2001) ("the *in pari delicto* defense . . . is limited to the situation where the plaintiff's responsibility is 'essentially indistinguishable' from or 'clearly greater' than the responsibility of the defendant."). Here, where Holy Cross sought to change the provisions in question, *see e.g.* FAC ¶¶59-60, no such conclusion can be reached.

Moreover, "the 'combination or conspiracy' element of a section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion." *MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967, 973 (7th Cir.1995); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 615 (7th Cir. 1997), *abrogated on other grounds by Rivet v. Regions Bank of La.*, 522 U.S. 470 (1998).

The co-conspirators need not share the same motive or goal; it is sufficient to allege that the co-conspirators "acquiesc[ed] in an illegal scheme." *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161, (1948). In *Spectators' Communication Network, Inc. v. Colonial Country Club*, 253 F.3d 215 (5th Cir. 2001), the Fifth Circuit held that the plaintiff had presented "sufficient evidence of a combination or conspiracy when one conspirator . . . is enticed or coerced into knowingly curtailing competition by another conspirator who has an anticompetitive motive." *Id.* at 222; *see also Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1163 (7th Cir. 1987) (the fact that a party was "coerced into agreeing is of no moment; an agreement procured by threats is still an agreement for purposes of section 1").

### D.   Defendants' Other Arguments Are No More Persuasive

Defendants' other arguments fail for similar reasons. They assert that the fact that American Anesthesiology excessively used "locum tenens" anesthesia providers somehow provides an alternative reason, unrelated to the antitrust claims, for Holy Cross' damages. But the FAC explains that this excessive use of locum tenens providers was one of the deficiencies in American Anesthesiology's actions under the Agreement. *See* FAC ¶¶30(c), 31. Holy Cross was

11

forced to accept these deficiencies by Defendants because it had no choice but to continue to extend the Agreement because of the nonsolicitation clause and the noncompete agreements. As explained in the FAC, "Defendants are able to obtain these levels of reimbursement only because of their elimination of competition through the enforcement of their noncompetes and the nonsolicitation clause." *Id.* ¶33.

Additionally, Defendants argue that because the FAC discusses shortages in the availability of anesthesia providers, that presents an independent cause for harm. But it does nothing of the sort. The FAC explains that the shortage of anesthesia providers is what makes the effect of the nonsolicitation clauses and noncompete clauses so devastating. Because of these shortages, Holy Cross had nowhere else to turn but to American Anesthesiology's providers in order to staff the hospital's anesthesia services. *See* FAC ¶¶44-51. These paragraphs explain that "[t]here is no possibility that Holy Cross could obtain anesthesia services from other sources." *Id.* ¶50. Therefore, Holy Cross' only option was to utilize its existing providers. *Id.* The nonsolicitation clause and noncompete clauses prevented that from happening.

The idea that market conditions that give a defendant market power are somehow an independent cause that breaks the chain of causation between the antitrust violation and injury is legally and logically both unsupported and unsupportable. Market conditions are often factors that allow a defendant to commit antitrust violations, because they contribute to the defendant's market power.

One obvious example involves barriers to entry, i.e. market conditions that make entry difficult. "Barriers to entry may be defined as . . . 'factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291, 1308 (M.D. Fla. 2001) (quoting Areeda & Hovenkamp, *Antitrust Law* ¶ 409 at

509–10 (1992)). The presence of barriers to entry does not undercut an antitrust claim. In fact, they are often an element of an antitrust claim. *See e.g.*, *Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia*, 815 F.2d 1407, 1420 (11th Cir. 1987) (barriers to entry an element of tying claim); *Outlet Communications, Inc. v. King World Production, Inc.*, 685 F. Supp. 1570, 1577 (M.D. Fla. 1988) (same); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1123 (10th Cir. 2014) (barriers to entry as element of monopolization claim); and *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) (same).

The presence of shortages of anesthesia providers here has a similar impact. *See also Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 2018 WL 3032552, at *21 (S.D. Cal. June 19, 2018) (nursing shortage as a barrier to entry).

Again, Defendants' argument fails under their own analysis. They state, ECF No. 56 at p.7, that "a plaintiff lacks standing to sue over a defendant's actions 'if an independent source would have caused him to suffer the same injury.'" (Citing *Swann v. Sec'y, Georgia*, 668 F.3d 1285, 1288 (11th Cir. 2012).) The FAC certainly does not state that a shortage of anesthesiologists by itself would have caused the injury independent of the noncompetes and nonsolicitation clause. It says just the opposite; that that shortages are what made the noncompetes and nonsolicitation clauses particularly anticompetitive, because the shortages made access to American Anesthesiology's providers so critical, and the nonsolicitation provision and noncompete agreements prevented that access. Defendants' own statement of the standard makes clear that their arguments should be rejected.

**E.    <u>A Favorable Decision Will Redress Holy Cross' Injuries</u>**

Redressability requires the plaintiff to show that its injuries are "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, (2016) (citing *Lujan*, 504 U.S. at 560–61). Often, this requirement is satisfied "in exactly the same manner as the causation

requirement is satisfied." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1274 (11th Cir. 2003).

The injury here – loss of revenues due to understaffing, and overpayment to American Anesthesiology – is certainly redressable by the damages that Holy Cross claims. Holy Cross' injury is that it was forced to pay too much and to accept too few services, to its detriment. Damages will directly address the losses that have resulted from these injuries. *See Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) ("Plaintiffs allege a monetary injury and an award of compensatory damages would redress that injury.").

Yet again, Defendants' own language establishes why their argument must fail. Their brief notes, ECF No. 56 at p.11, that for an interest to be redressable, it "must consist of obtaining compensation for . . . the violation of the legally protected right." (Citing *Vt. Agency of Natural Res. v. U.S. ex rel. Stevens,* 529 U.S. 765, 772 (2000).) That is precisely what Holy Cross seeks here, compensation for its coerced excessive payments and its losses due to inadequate staffing.

Once again, Defendants' position also defies logic and basic antitrust principles. They say that Holy Cross cannot be compensated because it would owe money under the Agreement in any event. By their logic, no plaintiff that ever entered into a purchase agreement for a price fixed product could ever claim damages, because they owed the higher price under the agreement. Of course, in both circumstances, the agreement does not override the antitrust laws. If excessive payments have been made due to an antitrust violation, they are compensable.

## V.   <u>REQUEST FOR HEARING</u>

Holy Cross requests a hearing on this motion. Because of the significance of Defendants' request for relief to the ultimate outcome of the case, Holy Cross believes that a full discussion of the parties' arguments would be helpful to the Court. Holy Cross estimates that such a hearing should not require more than one hour's time.

14

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion should be denied.

Dated: July 25, 2024

s/Peter R. Goldman
_____
Peter R. Goldman (FL Bar No. 86056)
Nelson Mullins Riley & Scarborough LLP
100 S.E. 3rd Ave., Suite 2700
Fort Lauderdale, FL 33394
(954) 745-5239 (p)
(954) 761-8135 (f)
peter.goldman@nelsonmullins.com

s/David A. Ettinger (with permission)
_____
David A. Ettinger (P26537) (admitted pro hac)
Benjamin VanderWerp (P84614) (admitted pro hac)
Honigman LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
(313) 465-7368 (p)
(313) 465-7369 (f)
dettinger@honigman.com
bvanderwerp@honigman.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 25, 2024, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Peter R. Goldman
Peter R. Goldman

56772334.14